Sol J. ELLERIN, a stockholder of The General Tire & Rubber Company, suing on behalf of himself and all other stockholders similarly situated, and on behalf and in the right of The General Tire & Rubber Company, Plaintiff,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, and The General Tire & Rubber Company, Defendants.

United States District Court
S. D. New York.
Aug. 1, 1958.

* Emphasis supplied.

Morris J. Levy, New York City, for plaintiff.

Tanner, Friend, Kinnan & Post, New York City, and Rowland H. Long, Spring-

field, Mass., for defendant Massachusetts Mut. Life Ins. Co.   Edward T. Post, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant The General Tire & Rubber Co., John F. Dooling, Jr., New York City, of counsel.

HERLANDS, District Judge.

On defendant Massachusetts Mutual Life Insurance Company's motion and plaintiff's cross-motion for summary judgment, the dispositive question of law is whether a particular issue of preferred stock constitutes a "class" of stock as distinguished from a "series" of stock. This question of the distinction between "class" and "series" is a matter of novel impression under the "insider's profit" provision of the Securities Exchange Act of 1934, section 16(b) [15 U.S.C.A. section 78p(b)].

The distinction is of critical importance because the operation of the statute depends in part upon the status of the alleged insider—in this case defendant Massachusetts Mutual Life Insurance Company—as "the beneficial owner of more than 10 per centum of any *class* of any equity security." (Emphasis supplied.)

Plaintiff sues to recover, on behalf of defendant The General Tire & Rubber Company (called herein "General Tire"), profits realized by defendant Massachusetts Mutual Life Insurance Company (called herein "Massachusetts Mutual") from the purchase and sale of General Tire's common stock.

The action is grounded on section 16(b) of the Securities Exchange Act of 1934 [15 U.S.C.A. section 78p(b)].

Defendant Massachusetts Mutual acquired 7,142 856/1000 shares of common stock of General Tire on November 30, 1954 and December 14, 1954.   This was effected through the conversion of certain shares of other stock of General Tire. The nature of this other stock is immaterial to the present inquiry.

Between November 26, 1954 and February 4, 1955 defendant Massachusetts Mutual sold the 7,142 856/1000 shares of common stock, thereby realizing a profit.

At all pertinent times, defendant Massachusetts Mutual was the owner of 2,500 shares of 3¾% Cumulative Preferred Stock of General Tire.

General Tire was authorized (by its amended articles of incorporation) to issue 150,000 shares which "shall be classified as Cumulative Preferred Stock."   Of this number of authorized shares of Cumulative Preferred Stock, General Tire initially issued 75,000 shares which were designated as 4¼% Cumulative Preferred Stock.   Said 4¼% Cumulative Preferred Stock was registered under the Securities Exchange Act of 1934 on April 5, 1945 and was listed on the New York Stock Exchange on April 26, 1945.

Subsequently, an additional 25,000 shares were issued pursuant to said authorization and were designated as 3¾% Cumulative Preferred Stock.   Said 3¾% Cumulative Preferred Stock was registered under the Securities Exchange Act of 1934 on June 4, 1946 and listed on the New York Stock Exchange on July 3, 1946.

The certificate of incorporation, which authorized the issuance of the Cumulative Preferred Stock, provided for the original issue of 75,000 shares as the initial series and also provided that subsequent Cumulative Preferred Stock may be issued from time to time in one or more series of Cumulative Preferred Stock.   As to these subsequent issues of Cumulative Preferred Stock, the certificate of incorporation authorized the Board of Directors to fix certain characteristics, but all shares of Cumulative Preferred Stock "shall be identical with each other in all [other] respects."

At the time Massachusetts Mutual bought and sold the 7,142 856/1000 shares of common stock, while the owner of 2,500 shares of 3¾% Cumulative Preferred Stock, there was outstanding approximately 52,488 shares of 4¼% Cumulative Preferred Stock and 18,605 shares of 3¾% Cumulative Preferred Stock.

The statute [15 U.S.C.A. § 78p(b)] provides:

"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months * * * shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer * * *"

The "such beneficial owner" referred to in clause "(b)" refers to the beneficial owners required to register under clause "(a)":

"(a) *Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security* (other than an exempted security) which is registered on a national securities exchange * * * shall file, at the time of the registration of such security or within ten days after he becomes such beneficial owner, * * * a statement with the exchange (and a duplicate original thereof with the Commission) of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been any change in such ownership during such month, shall file with the exchange a statement (and a duplicate original thereof with the Commission) indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month." (Emphasis supplied.)

Defendant Massachusetts Mutual contends that it does not own 10 percent of "any class of any equity security" because—although its 2,500 shares of 3¾%

Cumulative Preferred Stock are more than 10 percent of the outstanding 3¾% Cumulative Preferred Stock—said shares are less than 10 percent of *all* outstanding Cumulative Preferred Stock. The essence of Massachusetts Mutual's argument is that *all* of the Cumulative Preferred Stock constitutes the *class* and that the 3¾% Cumulative Preferred Stock and the 4¼% Cumulative Preferred Stock constitute only *series* within that class.

Plaintiff, on the other hand, asserts that—notwithstanding the reference in the articles of incorporation to the Cumulative Preferred Stock as a "class" and to the 3¾% and 4¼% Cumulative Preferred Stock as a "series" within that class—for purposes of the particular controlling statute the 3¾% Cumulative Preferred Stock and the 4¼% Preferred Stock constitute separate "classes."

The evidentiary facts have been stipulated. Consequently, only the above-indicated question of law need be resolved by the Court. Two other issues of law raised by the parties need not be decided because the Court's decision of this specific issue is determinative of the case.

The parties' arguments are largely derived from the literal wording of the statute. Defendant-Massachusetts Mutual asserts that the words used in the statute—"any class of any equity security"—are to be sharply distinguished from the phrase "any equity security"; that the statute is not aimed at a holder of 10 percent of any equity security but only at the holder of 10 percent of any *class* of any equity security; that the 3¾% Cumulative Preferred Stock is an equity security but it is not a "*class*" of equity security; and that it is simply one of two series of a class of equity security, the class being the Cumulative Preferred Stock.

On the other hand, plaintiff argues that the statute applies to "any class of any equity security"; that the word "any" modifying "class" necessarily indicates an all-inclusive grouping that would include every class or series; that, if Con-

gress had meant to limit the application of the statute to owners of a *general* class of equity security, it would not have used the phrase *"any class of any* equity security"; and that the language used by Congress would include the 3¾% Cumulative Preferred Stock as a class.

In interpreting this statute, the Court is called upon to ascertain the underlying Congressional policy and to give it the fullest possible scope consistent with the legislative language. Where the statutory policy is manifest but unclearly expressed, the Court's duty is to read the words of the statute in the context of that policy. Cox, Judge Learned Hand and the Interpretation of Statutes, 60 Harv.L.Rev. 370 (1946); Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 528 (1947); Frank, Words and Music: Some Remarks on Statutory Interpretation, 47 Colum.L.Rev. 1259 (1947); Silving, A Plea for a Law of Interpretation, 98 U. of Pa.L.Rev. 499 (1950); A Symposium on Statutory Construction, 3 Vand.L.Rev. 365 (1950).

The opening words of the very subsection involved in this case delineate the legislative purpose: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer," profits realized on short-swing sales inure to the benefit of the corporation. The relationship Congress speaks of is the relationship of a director, or an officer, or a beneficial owner of 10 percent of "any class of any equity security" where the stock is registered on a national exchange. The objective is evident: to prevent insiders from making any short-swing profits by using information which they may have obtained by virtue of their being insiders. The specific problem presented, therefore, is whether or not defendant-Massachusetts Mutual, as the beneficial owner of more than 10 percent of the 3¾% Cumulative Preferred Stock is in the position of an "insider" as visualized and defined by the statute. Cf. Loss, Securities Regulation, 577–578 (1951). Thus, to restate the question, the Court must determine whether the 3¾% Cumulative Preferred Stock was a completely separate "class" so as to give a 10 percent holder of that stock an insider's position in the corporation, or whether that stock was simply part of a larger "class" (cumulative preferred stock), and a 10 percent holder of the 3¾% Cumulative Preferred Stock would not be in the position of an insider in light of the size of the entire "class" (cumulative preferred stock).

This is a matter of first impression.[1] No case has thus far considered what is

---

1. Other aspects of the general problem of "classes" of stock are mirrored in the administrative activities of the Securities And Exchange Commission. For example, Securities Act of 1933 Release No. 2029 (for August 8, 1939) deals with the question of exemption from registration for certain types of refunding issues, particularly where the new refunding security is divided into two different blocks, one of which is offered in exchange to the existing security holders and the other is sold privately for cash. The release contains the text of the opinion of the SEC General Counsel, in the course of which the following statements were made:

"The subject company has an 'open end' mortgage upon its properties, the only issue of bonds now outstanding thereunder being denoted as Series A bonds.

It is proposed to create two new series of bonds under the mortgage, to be called Series B and Series C bonds respectively, for the purpose of refunding the outstanding bonds. The Series B and Series C bonds will differ substantially from each other in respect of maturity date, interest rate, redemption prices and default provisions. * * *

"It appears, therefore, that both with respect to Section 3(a) (9) and with respect to Section 4(1) the necessity of registering the Series B and Series C bonds depends upon whether they should be deemed separate issues or merely parts of a single issue: I believe it unnecessary at this time to enter into any extended discussion of what constitutes an 'issue' for the purposes of the Act." * * *

"Since on the fact submitted the Series B and Series C bonds appear to be se-

a "class" of stock for the purposes of this section.

The Court will first examine both the differences and similarities between the 4¼% Cumulative Preferred Stock and the 3¾% Cumulative Preferred Stock. These differences will then be analyzed in terms of the purpose of the statute.

The following differences are noted:

(a) The securities were issued, registered under the Securities Exchange Act of 1934, and listed on the New York Stock Exchange at different times. The 4¼% Cumulative Preferred Stock was registered and listed about fourteen months prior to the registration and listing of the 3¾% Cumulative Preferred.

(b) The dividend rate of the 4¼% Cumulative Preferred Stock is $4.25 per annum, whereas the dividend rate of the 3¾% Cumulative Preferred is $3.75 per annum.

(c) The redemption prices, otherwise than through the Sinking Fund, differ. For the 4¼% Cumulative Preferred Stock, said price ranges from $108.50 per share, plus accrued dividends, if re-

---

curities of different classes, they constitute separate 'issues,' and may be offered and sold in the manner above described without being registered under the Securities Act.

"In expressing this opinion I do not mean to imply that any difference in the incidents of two blocks of securities, however trivial, renders the blocks separate classes and consequently separate 'issues' for the purposes of the Act. In this case, however, the differences between the Series B and Series C bonds are, I believe, sufficiently substantial to warrant treating them as separate classes even though they will be issued under the same mortgage indenture."

Registration Statement Under The Securities Act of 1933 (Form S-1, as revised 10-25-55), Item 13, Capital Stock Being Registered, contains the following language, in part:

"If capital stock is being registered, state the title of the class and furnish the following information:

"(a) Outline briefly (1) dividend rights; (2) voting rights; (3) liquidation rights; (4) pre-emptive rights; (5) conversion rights; (6) redemption provisions; (7) sinking fund provisions; and (8) liability to further calls or to assessment by the registrant.

"(b) If the rights of holders of such stock may be modified otherwise than by a vote of a majority or more of the shares outstanding, voting as a class, so state and explain briefly.

"(c) Outline briefly any restriction on the repurchase or redemption of shares by the registrant while there is any arrearage in the payment of dividends or sinking fund installments. If there is no such restriction, so state."

The same language appears in Application For Registration Of Securities On A National Securities Exchange Pursuant To The Securities Exchange Act Of 1934 (Form 10, as revised 10-25-55), Item 14.

Application For Registration Of Additional Classes Or Series Of Securities On A National Securities Exchange Pursuant To The Securities Exchange Act Of 1934 (Form 8-A, as adopted January 28, 1954), Item A, reads as follows:

"A. Rule as to Use of Form 8-A: Definition of Class

"(a) This form shall be used for registration under the Securities Exchange Act of 1934 of additional classes of securities on an exchange on which one or more other classes of securities of the registrant are listed and registered, provided Form 10, 12 or 12-A would be appropriate for such registration if the registrant did not have securities so listed and registered.

"(b) If a class of security is issuable in two or more series with different terms, each such series shall be deemed a separate class for the purposes of this form."

In evaluating the above SEC material as possibly useful analogies, it is well to remember the following observations in Hayakawa, Language In Action (1939), ch. 10, "Classifications": "What we call things and where we draw the line between one class of things and another depend upon the interests we have and the purposes of the classification. (p. 151.) * * * When we name something, then, we are classifying. *The individual object or event we are naming, of course, has no name and belongs to no class until we put it in one.* (p. 152; emphasis in original.) * * * Are these classifications 'real'? Of course they are, and *the effect that each of them has* upon what he may not do constitutes their 'reality.'" (P. 153; emphasis in original.)

deemed prior to April 1, 1946, to $105.50 per share, plus accrued dividends, if redeemed on or after April 1, 1951. The prices for the 3¾% Cumulative Preferred Stock range from $104.75 per share, plus accrued dividends, if redeemed prior to April 1, 1949, to $102.25 per share, plus accrued dividends, if redeemed on or after April 1, 1953.

(d) The Sinking Fund redemption price for the 4¼% Cumulative Preferred Stock was fixed at $105.50 per share, plus accrued dividends. The price for the 3¾% Cumulative Preferred Stock was $102.25 per share, plus accrued dividends.

(e) The Sinking Fund provisions also differ. For the 4¼% Cumulative Preferred Stock, General Tire must set aside cash sufficient to redeem 2½% of the aggregate number of shares of 4¼% Cumulative Preferred Stock originally issued, at the Sinking Fund price, from 1948 through 1979. Beginning with 1980 and through 1984, General Tire must set aside cash sufficient to redeem 4% of the aggregate number of shares of 4¼% Cumulative Preferred Stock originally issued. For the 3¾% Cumulative Preferred Stock, General Tire must set aside cash sufficient to redeem 2½% of the aggregate number of shares of 3¾% Cumulative Preferred Stock originally issued, beginning in 1949. This 2½% figure is not increased at a later date as it is in the provisions dealing with the 4¼% Cumulative Preferred Stock.

(f) The Board of Directors was given the power, with respect to the unissued shares of Cumulative Preferred Stock, to:

(1) Divide shares into series and designations.

(2) Fix the annual dividend rate.

(3) Fix the redemption price.

(4) Fix the amount payable on liquidation, dissolution or winding up.

(5) Fix conversion rights.

(6) Fix the obligations of the issuer to redeem and retire the stock and methods of doing so.

Any differences between the 4¼% and the 3¾% Cumulative Preferred Stock created pursuant to these powers have been specifically set forth in "(a)" through "(e)" supra.

(g) While the rest of the language in the terms and provisions of both the 4¼% and the 3¾% Cumulative Preferred Stock is identical, plaintiff claims that, as applied, there are the following indications of possible differences between the two issues:

(1) "The Cumulative Preferred Stock of any series may be redeemed in whole or in part at the option of the Corporation, by vote of the Board of Directors * * *" Thus, the two groups of stock under consideration may be redeemed separately.

(2) "* * * [I]f any such amendment, alteration or repeal would adversely affect the rights or preferences of outstanding shares of Cumulative Preferred Stock of any particular series without correspondingly affecting the rights or preferences of the outstanding shares of all series alike, affirmative vote of the holders of at least sixty-six and two third percent (66⅔%) of the Cumulative Preferred Stock of that particular series at the time outstanding shall also be necessary for effecting or validating such amendment, alteration or appeal." Thus, the groups of stock vote separately under certain conditions.

In all other ways, the two groups of Cumulative Preferred Stock are identical. The following are the more important identities:

(a) Both series have the same par value—$100 per share.

(b) All shares of the Cumulative Preferred Stock are of equal rank with each other, regardless of series.

(c) There is no preference as to dividends, all series of the Cumulative Preferred Stock being equal in this respect.

(d) All such series are preferred as to dividends over the common stock.

(e) All such series do not participate in profits other than the fixed yearly dividend.

(f) All such series vote together, as a class, for the purpose of the changes expressed in clause "6" of the "Statement of The Expressed Terms and Provisions of Each Class of Shares of the Corporation."

(g) All such series vote together, as a class, for the purpose of effecting or validating any amendment, alteration or repeal of any provision of the articles of incorporation that would adversely affect the rights or preferences of the holders of the Cumulative Preferred Stock.

(h) All such series of Cumulative Preferred Stock have no voting powers except as noted above; and except, in the event four quarter-yearly dividends are in default in whole or in part, then the holders of all Cumulative Preferred Stock, voting as a class, can elect one-third of the Board of Directors.

(i) If upon liquidation or dissolution there are insufficient funds to pay all the holders of Cumulative Preferred Stock in full, "the holders of all series of Cumulative Preferred Stock shall share ratably in any distribution of assets in accordance with the sums which would be payable on such shares if all sums payable were discharged in full."

(j) No holder of any series of Cumulative Preferred Stock has preemptive rights.

■ Probably the most important single factor in determining whether a series of stock is a "class" for the purposes of a statute regulating transactions by insiders who may be making unfair use of inside information, is voting rights. The usual way to control a modern corporation is by having voting control. A small percentage of the voting stock of a widely held corporation listed on a national exchange is sufficient to control the corporation. Thus, a 10 percent owner of voting stock is in a strategic position to control, or influence the control, of the corporation. Such a position would mean that the holder would be an insider and have access to inside information. Congress set the figure at 10 percent.

Congress believed that anyone who held 10 percent of the voting stock of the corporation whose stock was listed on a national exchange would have access to inside information. However, Congress did not require 10 percent of the voting stock but phrased the statute in terms of 10 percent control of "any equity security" listed on a national exchange.

For the purpose of determining whether an issue of stock is a separate class, voting rights are of vital importance.

Usually, only one category of stock has voting rights. If several categories have voting rights, frequently there are differences between such voting rights.

Such differences in the important matter of voting rights alone might well strongly suggest that there are different classes of stock. On the other hand, if the voting rights are identical, that would constitute a persuasive consideration that the stock should be treated as one "class" for the purposes of a statute regulating insider trading.

The only discernible difference between the two groups of stock, as far as voting rights are concerned, exists in the situation where only the rights and preferences of one of the series are being adversely effected by an amendment of the corporate charter. This is not a fundamental difference in voting-rights.

Another feature indicating that we are dealing with a single class of stock is that neither series has any rights in preference to the other. Neither is preferred as to dividends or on liquidation. If these series were in any way preferred one over the other on liquidation or for the purposes of payment of dividends or for any other purpose, it would be a strong indication that these were different classes. The fact that they are treated alike would tellingly indicate that they are in fact one class.

Another indication that we are here dealing with two series rather than with two classes is that the articles of incorporation themselves refer to the Cumulative Preferred shares as a class, making provision for its issuance in "series."

It is also noteworthy that a "class" to be known as "Second Preferred Stock" and a class to be known as "Common Stock", were created by the articles of incorporation. Thus, in setting up three classes of stock and providing for the issuance of series within these classes, the articles of incorporation unequivocally distinguished between classes and series.

■■ Finally, under the Ohio Code (General Tire is an Ohio corporation), it is permissible to create a class of stock and issue various series of the class with the differences between the series identical to those that appear between the issues of stock under consideration. Baldwin's Ohio Revised Code, 1957 Legislative Issue, § 1701.07 (may be different as to dividend rate; the dates of payment of dividends and dates from which they are cumulative; redemption rights and price; sinking fund requirements; conversion rights; and restrictions on issuance of shares of the same series or of any other series). Not all these differences have been adopted by General Tire. The Court need not decide what the result would be if General Tire fully exercised all its rights under this statute. The Ohio statute is not controlling. But see Seligman, Problems Under The Securities Exchange Act, 21 Va.L.Rev. 1, 7 (1934). The following comment appearing in Throckmorton's Compilation of Ohio Statutes shows the distinction between class and series that may be implied from the statute:

> "Furthermore, the distinction between a series and a class is made clear. The board of directors may be authorized to fix the terms and provisions with respect to which one series may vary from another. Note, however, that there cannot be delegated to the board power to change the priority of any series. *All series of the same class must have equal rank with respect to dividends and assets although the amounts of their participation therein may be different.*" (Emphasis supplied.)

Under the Model Business Corporation Act, section 15; Ill.Rev.Stat. (1957) Chap. 32, section 157.15; N. Y. Stock Corp. Law, section 11; Purdon's Penna. Stat. Anno., Title 15, section 2852–602, the differences between the 3¾% and the 4¼% Cumulative Preferred Stock would create only separate series and not separate classes.

In sum, the factors of voting rights, preferences, terms of the certificate of incorporation, and the statutory scheme indicate that the 3¾% and the 4¼% Cumulative Preferred Stock are two series of a single class of stock.

The critical feature, however, is that defendant-Massachusetts Mutual may not correctly be considered to be an "insider"; and this statute was not intended to apply to the type of stockholder exemplified by Massachusetts Mutual. If this were *voting* stock divided into "series," there is the possibility that the Court might veer toward the view that the series are to be deemed separate classes for the purposes of this statute and under the other circumstances of this case. The Court expresses no definitive opinion on that hypothetical situation. What is of vital significance is that, in the present case, the stock under consideration *is not voting stock.* It would in no way further the policy expressed in the statute to hold that the series are separate classes.

The only substantially meangingful difference between these two series, for present purposes, is the dividend rate. In all probability, this difference reflects the condition of the securities market at the time when each series was issued. The fact that they were issued and registered at different times is not of controlling importance. Stock in the same class is often issued and registered at different times.

The difference in the redemption price (sinking fund and non-sinking fund) is probably attributable to the same economic condition reflected in the difference in the dividend rate and also to the objective of protecting the higher dividend rate. Furthermore, the difference referred to is relatively small; and would seem to be insignificant in determining whether one is or is not an insider. In point of fact, the difference in the Sinking Fund provisions—from 1980 through 1984 the amount of a 4¼% stock to be redeemed is 4% of the original issue rather than 2½%—means only that the 4¼% stock will be completely redeemed by 1984, the 3¾% stock by 1988. That the Board of Directors may, at its option, redeem completely an entire series is seen to have only minor impact in light of the additional fact that the Board has the same power to redeem any part of any series; and, thus, could redeem part of each series. The Board could redeem part of the entire class as readily as it could redeem part or all of a series.

As already pointed out, the only really significant difference is the dividend rate. In view of the special purpose of the legislation, the fact that the 3¾% stock and the 4¼% stock are of equal rank for all purposes and have the same limited voting rights is a more persuasive indication that the two stocks should be treated as separate series of the same class and not as separate classes.

■ The Court, therefore, concludes that the entire Cumulative Preferred Stock must be considered as the "class" for the purposes of the statute. Because defendant-Massachusetts Mutual did not at any time own 10 percent of this "class" of equity security, it need not account for profits realized on the short-swing sale.

Defendant-Massachusetts Mutual's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied.

Settle order on notice.