**CHEMICAL FUND, INC., Plaintiff-Appellant,**

v.

**XEROX CORPORATION, Defendant-Appellant.**

**No. 140, Docket 30567.**

United States Court of Appeals Second Circuit.

Argued Nov. 7, 1966.

Decided May 9, 1967.

Immanuel Kohn, New York City (John T. Cahill, Cahill, Gordon, Reindel & Ohl, New York City, and Moser, Johnson & Reif, Byron Johnson, Rochester, N. Y., on the brief, J. Bernard Quigley, New York City, of counsel), for plaintiff-appellant.

William H. Morris, Rochester, N. Y. (Nixon, Hargrave, Devans & Doyle, Rochester, N. Y., on the brief), for defendant-appellant.

Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., Edward B. Wagner, Special Counsel, and Martin D. Newman, Securities and Exchange Commission, Washington, D. C., on the brief of the Securities and Exchange Commission, amicus curiae.

Before LUMBARD, Chief Judge, and MEDINA and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge:

The principal issue on this appeal is whether Chemical Fund, the owner of more than ten percent of Xerox Convertible Debentures, is liable for short-swing trading profits as a "beneficial owner of more than 10 per centum of any class of any equity security" within the meaning of section 16 of the Securities Exchange Act of 1934, 48 Stat. 896 (1934), as amended, 15 U.S.C. § 78p. We think not. As Chemical Fund at no time would have owned more than 2.72 percent of Xerox common stock had it chosen to convert all its Debentures into common stock, we hold it was not liable for the profits realized from the purchase of Debentures and the sales of common stock within six months of such purchases. Accordingly, we reverse the judgment of the district court and direct that summary judgment be entered in favor of Chemical Fund on its complaint and that the counterclaim of Xerox be dismissed.

Chemical Fund brought this suit against Xerox for declaratory judgment in the Western District of New York in November 1963 after it had filed certain forms with the Securities and Exchange Commission and a claim for short-swing profits had been asserted against it. Xerox filed an answer and counterclaimed for profits received by Chemical Fund from its transactions. In June 1965 both parties moved for summary judgment. The district court in April 1966 granted summary judgment to Xerox for $153,972.43, without interest, and dismissed Chemical Fund's complaint.

Chemical Fund appeals from the dismissal of its complaint for declaratory judgment and from the judgment in favor of Xerox on the counterclaim. In addition to its claim that it was not a 10 percent holder "of any class of any equity security," it claims that section 16 is not applicable since all purchases of Xerox securities at issue were made in arbitrage transactions specifically exempted by section 16(d) (now section 16(e), 15 U.S.C. § 78p(e)). Xerox cross-appeals only from the denial of interest on the judgment, having abandoned its other claim that the subsequent conversion of the Debentures was a "sale" and that profits should have been computed accordingly. See Blau v. Lamb, 363 F.2d 507 (2 Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (Jan. 10, 1967). As the question raised is of first impression, we asked the Commission to file a brief amicus, which it has done.

The facts are undisputed. Chemical Fund, organized in 1938, is an open-end diversified investment company, registered under the Investment Company Act of 1940, 54 Stat. 789 (1940), as amended, 15 U.S.C. §§ 80a—1–52. In November 1963 it had about 60,000 shareholders and owned securities of 62 corporations, one of which was Xerox. Since 1954 Chemical Fund has held an investment in Xerox common stock, of

which it owned 91,000 shares, 2.36 percent of the 3,851,844 shares outstanding, in early December 1962. It also acquired 4½ percent Xerox Convertible Subordinated Debentures due May 1, 1981 after they were issued in 1961; in early December 1962 it held $1,486,000 of a total of $15,072,400 principal amount of the Debentures. Each $1,000 Debenture was convertible into approximately 9.5 shares of common stock and was protected against dilution of the conversion right, but carried no voting rights or participation in the equity of Xerox.

In December 1962 Chemical Fund, pursuant to a program designed to increase its secured position and improve its yield from its Xerox investment without sacrificing its ability to take advantage of the continuing appreciation of Xerox common stock, commenced to sell some of its Xerox common stock and to purchase Xerox Debentures convertible into the same number of shares of common. The yield on the Debentures was approximately 2.8 percent of the November 30, 1962 mean market price of $1,607.50, compared to a yield on the common of some .66 percent of the mean price of $150.62. From December 4 through 20, 1962, and again from April 24 through August 2, 1963, the Fund purchased $318,000 principal amount of Debentures, convertible into 3029 shares of Xerox common, and during this period it sold 3000 shares of common stock.[1] After the Fund had purchased $11,000

principal amount of Debentures on December 4 and again on December 12, 1962, it held more than 10 percent of the outstanding Convertible Debentures. It continued to hold more than 10 percent of the outstanding Debentures until November 22, 1963, after Xerox had called the Debentures for redemption, when it converted all its Debentures, $1,804,000 in principal amount, into 17,180.95 shares of common stock.[2]

Judge Burke in computing profits matched purchases of Debentures from December 12, 1962 through August 2, 1963, against sales of common stock within a six-month period.[3] As the market price of Xerox common was at all times substantially above the conversion price, the right of conversion caused the price of the Debentures to fluctuate with the market price of the common. Because of the constantly rising price of the common stock, matching the highest sales with the lowest purchases, see Smolowe v. Delendo Corp., 136 F.2d 231, 148 A.L.R. 300 (2 Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943), resulted in a "profit" of $153,972.43, even though, as the district court noted, the series of transactions as a whole resulted in a substantial net loss because of the premium paid for the higher yield and senior position of the Debentures.

The Securities Exchange Act provides in section 16 that a corporation to which

1. In addition to the sale of 3000 shares of common stock which was offset by purchases of Convertible Debentures, 13,500 shares of common stock were also sold, apparently pursuant to a recommendation in the long range investment program that, in view of significant advances in the market price of Xerox common stock and the graphic arts industry in general, a portion of Xerox common stock ought to be sold in order to reduce its percentage in the total investment portfolio.

2. The market value of the 17,180.95 shares obtainable through conversion, using the mean sale price of $349.00 on November 21, 1963, was approximately $5,966,152. Had Chemical Fund permitted its $1,804,000.00 debentures to be redeemed it would have received only $1,876,160.

3. As we hold that Chemical Fund was not subject to section 16, we do not decide whether, in view of the presence of factors which influence the price of convertible debentures but not that of common, see, e. g., Graham, Dodd & Cottle, Securities Analysis 602–04 (4 ed. 1962), this computation was correct. See generally, e. g., Blau v. Lamb, supra, 363 F. 2d at 525; Smolowe v. Delendo Corp., supra, 136 F.2d at 237 n. 13; 31 Fed. Reg. 3391 (1966), amending 17 C.F.R. § 240.16b–9; Hamilton, Convertible Securities and Section 16(b): The End of an Era, 44 Texas L.Rev. 1447, 1488–92 (1966).

it applies may recover profits realized by an officer, director, or "beneficial owner of more than 10 per centum of any class of any equity security" of the corporation from purchases and sales of such equity securities within any period of less than six months. Section 16(b) states that recovery of such profits was allowed: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner * * * by reason of his relationship to the issuer * * *." It is conceded that the Debentures are securities as defined in section 3(a) (10) of the Act, 48 Stat. 884 (1934), 15 U.S.C. § 78c(a) (10), and that they are equity securities because they are convertible into common stock. Under the definition in section 3(a) (11), 48 Stat. 884 (1934), 15 U.S.C. § 78c(a) (11), it is apparent that a Convertible Debenture is an "equity security" only because of its convertible nature, since an "equity security" is defined as "any stock or similar security; or any security convertible * * * into such a security * * * or any such warrant or right * * *."

▮ Thus the question is: are the Debentures by themselves a "class of any equity security," or does the class consist of the common stock augmented, as to any beneficial holder in question, by the number of shares into which the Debentures it owns are convertible? We think that the Debentures are not a class by themselves; the total percentage of common stock which a holder would own following a hypothetical conversion of the Debentures it holds is the test of lia-bility under section 16(b). The history of the legislation, the stated purpose of the Act, and the anomalous consequences of any other meaning all support this conclusion.

Nothing in the hearings which preceded passage of the Act in 1934 would indicate that the owners of Debentures as such ought to be considered as "insiders." Indeed, S. 2693, 73d Cong., 2d Sess. (1934) as introduced included bondholders as insiders, and was later revised to exclude them from the application of section 16.[4] The hearings did disclose instances where directors, officers and large stockholders profited through receiving information before it had become public knowledge. See, e. g., S.Rep.No.792, 73d Cong., 2d Sess. 9 (1934). Thus it is that section 16 is specifically concerned with "directors, officers and principal stockholders," and has adopted a rule that any stockholder owning more than 10 percent of an equity security is presumed to be an insider who will receive information regarding the company before it is made public. The reason that officers, directors and 10 percent stockholders have been held to account for profits on short-swing transactions is because they are the people who run the corporation, and who are familiar with its day to day workings. This is necessarily so of officers and directors, and there was ample basis for concluding that stockholders owning more than 10 percent of the voting stock of the company, if not in control, would be closely advised, as their votes usually elected the directors who

4. See Hearings on Stock Exchange Practices Before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess. 6423, 6430 (1934) (hereinafter cited as Hearings). The revision was apparently the result of the urging of witnesses before the Senate Committee on Banking and Currency. One such plea was entered by the National Association of Mutual Savings Banks:

"It seems plain that the principal evil to which the bill is directed is corporate control * * *

"Throughout the bill there are provisions which in terms include bonds and bond dealers and brokers but which the policy of the bill makes applicable only to stock and stock-handling houses. Consider 15(a) [now section 16(a)]. Bondholders as such exercise no control over the management of the issuer and its policies. In fact, that it was the holders of the stock and not the bonds who are in contemplation is suggested by the fact that the title of the section reads 'Transactions by Directors, Officers and Principal Stockholders.'" Hearings 7274.

in turn elected the officers, where these were not elected directly by the stockholders.[5]

But there is no reason whatever to believe that any holder of any Convertible Debentures would, by reason of such holding, normally have any standing or position with the officers, directors or large stockholders of a company so that such holder of Debentures would be the recipient of any inside information.[6] There is no provision which gives a holder of the Debentures any standing beyond that of a creditor entitled to certain specified payments of interest at stated intervals, and possessing numerous rights all of which are specifically spelled out in the trust indenture pursuant to which the Debentures were issued.

To hold that the beneficial owner of 10 percent or more of the Debentures is liable under section 16(b) would here impose a liability on an owner who by conversion of all his Debentures would obtain less than one-half of one percent of Xerox common stock. At the same time a holder of as much as 9 percent of Xerox common stock would not be liable. Thus Chemical Fund, able to command only 2.72 percent of Xerox common, would be liable for short-swing profits, although the holder of 9 percent of the common, more than three times Chemical Fund's total potential holding, would not be liable. We do not believe that Congress could have meant to apply the provisions of the Act to any holder of Convertible Debentures whose possible

equity position following full conversion of its Debentures would be less than 10 percent of the class of equity stock then outstanding.[7]

The Securities and Exchange Commission contends that the general legal and financial usage of the word "class" compels the conclusion that Chemical Fund was subject to section 16, citing Ellerin v. Massachusetts Mut. Life Ins. Co., 270 F.2d 259 (2 Cir. 1959). But this Court referred to the common meaning of "class" in that case because there was no prior case law, statutory history, or legislative definition to guide it. Here the purpose of section 16 to impose liability on the basis of actual or potential control is clear, and we should give it effect.

The Commission further argues that a holding that Chemical Fund did not hold more than 10 percent of any class of equity security would conflict with its long-standing administrative interpretation reflected in 17 C.F.R. § 240.16-a-2, which sets forth the manner in which 10 percent ownership is to be determined and which refers specifically, *inter alia*, to "the class of voting trust certificates or certificates of deposit." As with a Convertible Debenture, it is solely the right to convert a voting trust certificate and certificate of deposit into a "stock or similar security" that brings these interests within the statutory definition of "equity security." The Commission's ruling may well be justified in that some of the most glar-

---

5. See 78 Cong.Rec. 8037–38 (1934) (remarks of Representatives Lea of California, Mapes, and Rayburn).

6. During the period involved, Hulbert W. Tripp was an non-officer director of both Chemical Fund, Inc. and Xerox Corporation. However, if Congress had intended to eliminate the possibility of inside information becoming available through common directors, it would have legislated directly against common directorates, as it did in section 10 of the Investment Company Act of 1940, 54 Stat. 806 (1940), 15 U.S.C. § 80a–10.

7. The Securities and Exchange Commission in its *amicus* brief appears to recognize the anomaly which this result

would produce, but states that "there are necessarily anomalous results in the application of a statute with this type 'of rather uncommon regulatory mechanism.'" But where such results need not be reached in order to effectuate the purposes of section 16, the courts have declined to apply the section. See, e. g., Petteys v. Butler, 367 F.2d 528 (8 Cir. 1966), cert. denied, Blau v. Petteys, 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545 (Jan. 10, 1967); Blau v. Lamb, supra; Blau v. Max Factor & Co., 342 F.2d 304 (9 Cir.), cert. denied, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1865); Ferraiolo v. Newman, 259 F.2d 342 (6 Cir.), cert. denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959).

ing instances of abuse prior to the passage of section 16 were committed through the use of stock pools and combinations, see, e. g., S.Rep.No.792, 73d Cong., 2d Sess. 8–9 (1934), and voting trust certificates provide a vehicle for the exercise of actual control over a corporation by a relatively small block of common stock. But while the Commission's position may be tenable with respect to voting trust certificates, we are not persuaded that it should apply to Convertible Debentures, for the reasons we have stated. We note, however, that the Commission, apparently recognizing that unnecessary harshness would result from its own interpretation, took the further position that a class of voting trust certificates or certificates of deposit is deemed to consist not only of the voting trust certificates or certificates of deposit then outstanding, but of the total amount of certificates issuable with respect to the total amount of outstanding equity securities of the class which may be deposited under the voting trust agreement or deposit agreement, whether or not all of such outstanding securities have been so deposited. The size of the class is therefore necessarily related to the equity securities which underly it, as here we find the Convertible Debentures are related to the common stock of Xerox.

Lastly, the argument is made that Chemical Fund in substance admitted the applicability of section 16 when it filed Forms 3 and 4 with the Commission on September 17, 1963, after its directors were advised on August 14, 1963, that a possible question under the section existed, but did not file a disclaimer as permitted by 17 C.F.R. § 240.16a–3, which expressly declares "that the filing of such statement shall not be construed as an admission that such person is, for the purposes of Section 16 of the Act, the beneficial owner of any equity securities covered by the statement." The short answer to this argument is that there was no dispute as to whether or not Chemical Fund was the beneficial owner of the securities in question. Failure to file such a disclaimer cannot fairly be read to dispose of the question of statutory interpretation presented in this case.

In view of our holding that Chemical Fund was not subject to section 16, we do not pass on the remaining issues raised by the parties.

We reverse the judgment of the district court and direct that summary judgment be entered in favor of Chemical Fund on its complaint and that the counterclaim be dismissed.