**Richard MORALES, Plaintiff,**

**v.**

**NEW VALLEY CORPORATION, Harry I. Freund and Jay S. Goldsmith, Defendants.**

**No. 95 Civ. 1246 (CSH).**

United States District Court, S.D. New York.

July 31, 1996.

David Lopez, Southampton, NY, for Richard Morales.

Laurence V. Senn, Jr., Mudge Rose Guthrie Alexander & Ferdon, New York City, for New Valley Corporation.

Jay G. Strum, Kaye, Scholer, Fierman, Hays & Handler, New York City, for Harry I. Freund, Jay S. Goldsmith.

## MEMORANDUM OPINION
## AND ORDER

HAIGHT, Senior District Judge:

Plaintiff Richard Morales brings this action pursuant to section 16(b) of the Securities Exchange Act of 1934 (hereinafter the "1934 Act"), 15 U.S.C. § 78p(b), seeking disgorgement of alleged short-swing profits earned in transactions involving Class B cumulative convertible preferred stock ("B convertible") of New Valley Corporation ("New Valley"). Defendants Harry Freund and Jay Goldsmith (the "moving defendants") move jointly to dismiss under Rule 12(b)(6), Fed. R.Civ.P., arguing that they are not "beneficial owners" as that phrase is used in section 16(b). To be a "beneficial owner" and thus subject to liability under that provision, the individual must own at least 10% of "any class of any equity security." 15 U.S.C. § 78p(a). The instant motion raises a single, discrete issue deriving from this definition: whether a specific type of preferred stock, which is in many ways different from other nominal classes of stock in the corporation but which votes with the other classes on matters of general corporate concern, constitutes a separate "class" for the purposes of section 16(b). On the facts of the present case, I answer the question in the affirmative and therefore deny the motion to dismiss.

## I.

On a motion to dismiss under Rule 12(b)(6), the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980); *see Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 124 (2d Cir.1991). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The district court should grant a Rule 12(b)(6) motion "only if it is clear that

no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (*citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

Except in certain circumstances, consideration of a motion to dismiss the complaint must focus on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991). On a motion to dismiss, a district court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986), and the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir.1991). "[A] Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey–Ferguson, Ltd.*, 681 F:2d 111, 115 (2d Cir.1982).

The parties to this motion have submitted a number of documents extraneous to the pleadings. Generally, on a motion to dismiss under Rule 12(b)(6), the Court may only consider the complaint, documents attached to it or incorporated by reference, and matters of which judicial notice may be taken. *See Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). However, the law of this Circuit also allows courts to consider documents filed with the SEC and relied upon by plaintiff in composing the complaint. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991); *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991). Thus, the facts outlined below are derived from allegations in the complaint and New Valley's various filings with the SEC, primarily its Form S–1 Registration Statement and its certificate of incorporation contained therein.

## II.

Only certain facts alleged in the complaint and discussed in plaintiff's brief are relevant to the present dispute. For present purposes, it is sufficient to describe New Valley's capital structure, and the general nature of the allegations levied against the individual defendants.

New Valley's capital structure consists of three issues of equity securities: common stock, senior A preferred stock (the "A preferred), and B convertible. At all times relevant to this action, there were 189 million shares of common stock outstanding, 1.5 million shares of A preferred outstanding, and 2.8 million shares of B convertible outstanding.

The A preferred ranks senior to both the B convertible and the common stock with respect to the payment of dividends and the distribution of corporate assets upon liquidation. The B convertible ranks senior to the common stock in these respects. The precise dividend rate payable to the holders of A preferred and B convertible is for present purposes irrelevant: suffice it to say that the two classes are entitled to payments of different sizes and subject to different conditions. Holders of common stock are entitled to dividends only if there is enough to go around after the specified amounts have been paid to holders of A preferred and B convertible, and the Board of Directors decides that such a distribution is warranted.

The certificate of incorporation subjects A preferred to both mandatory and optional redemption provisions and the B convertible to an optional redemption provision. The optional redemption provisions are different for the two classes of stock. There is no provision in the certificate for redemption of common stock.

As far as voting rights are concerned, holders of both the A preferred and the B convertible are entitled to vote on "all matters upon which holders of Common Shares are entitled to vote," New Valley's Form S–1 at 12, that is, elections of directors and most matters of general corporate concern. Holders of A preferred receive 9.29 votes per share, while holders of common stock and B convertible receive only one vote per share.

If the board fails to pay dividends for six consecutive quarters, the A preferred and the B convertible are entitled to vote together to elect two directors to the board, with the A preferred and B convertible again receiving 9.29 votes and 1 vote per share respectively. Finally, holders of A preferred and B convertible are entitled to vote separately as a class on matters which affect each class uniquely. So, for example, should the corporation want to issue more A preferred shares, it would have to obtain the approval of a majority of the A preferred stock. In this way, the A preferred and B convertible shareholders can control the outcome of any decision which will impact upon the value of their security alone.

As its name indicates, the B convertible also has a conversion feature which is unique to that class. Subject to certain conditions which are not relevant for present purposes, holders of B convertible may convert their shares to common stock at any time. The conversion rate varies depending on the average market price of the common stock for the 30 days prior to conversion. However, there is a maximum conversion ratio of 8.33:1. Thus, under no circumstances, can a holder of B convertible receive more than 8.33 shares of common stock for each share of B convertible. The holder of converted shares votes together with the other common stockholders, receiving one vote for every share held. In this way, then, a holder of B convertible can augment his voting influence by effecting a conversion.

Defendants Freund and Goldsmith were at all relevant times holders of B convertible shares. The complaint alleges that they purchased additional shares on four separate occasions between March and May of 1994, and effected 10 separate sales of B convertible in September of 1994. The complaint further alleges that both of the two defendants were part of a "group" as that word is defined in section 13(d), 15 U.S.C. § 78m(d), and that in the aggregate, the group owned more than 10% of the outstanding B convertible shares at all relevant times. Specifically, New Valley's Form 13D statements reveal that the group owned 940,149, or approximately 34%, of the outstanding B convertible

during the time frame in question. At present, the moving defendants do not contest that they were members of a group that owned more than 10% of New Valley's outstanding B convertible shares.

Based on these allegations, plaintiff claims that the profits earned by Freund and Goldsmith in the above dealings should be disgorged and returned to the corporation pursuant to section 16(b) of the 1934 Act.

### III.

Section 16(b) of the 1934 Act requires that an officer, director, or "beneficial owner of more than 10 per centum of any class of any equity security"[1] disgorge and return to the corporation profits earned by that individual through purchases and sales of the security within a period of less than six months. 15 U.S.C. § 78p(b). The provision's stated purpose is to "prevent[ ] the unfair use of information which may have been obtained" by the listed individuals. *Id.* Specifically, the rule deters what has been commonly referred to as "short-swing speculation": situations in which insiders, with advance knowledge of information that will affect the market price of a stock, either buy low and sell high, or sell high and buy low within a relatively short time frame, thereby making a quick profit at the expense of the uninformed public.

■ Taking the allegations in the complaint as true, Freund and Goldsmith owned, as part of a group, more than 10% of New Valley's B convertible shares. Further, they effected purchases and sales of these shares within a 6–month period. Thus, on its face, the complaint states a claim against the two defendants under section 16(b). The moving defendants however, contend that the B convertible does not constitute a "class" of security for the purposes of section 16(b), and that *a fortiori*, they are not liable under that section as "beneficial owners of . . . any class of any security." Their argument derives from the very reason that "beneficial owners" are subject to liability under section 16(b) in the first place. The Second Circuit has stated it in the following terms:

> The reason that officers, directors and 10 percent stockholders have been held to account for profits on short-swing transactions is because they are the people who run the corporation, and who are familiar with its day to day workings. This is necessarily so of officers and directors, and there was ample basis for concluding that stockholders owning more than 10% of the voting stock of the company, if not in control, would be closely advised, as their votes usually elected the directors who in turn elected the officers, where these were not elected directly by the stockholders.

*Chemical Fund, Inc. v. Xerox Corporation,* 377 F.2d 107, 110–11 (2d Cir.1967). Thus, "[a]n equity owner of ten percent of a company's securities is treated as an 'insider' because of the potential control such an owner has over the board of directors of the company." *Schaffer v. Dickstein & Co., L.P.,* 1996 WL 148335, *2 (S.D.N.Y.), citing *Foremost–McKesson, Inc. v. Provident Securities,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).

Relying on this language, the moving defendants focus the analysis on their overall voting power in New Valley. They first note that B convertible votes with all other shares on most issues that confront the corporation. Thus, under the moving defendants' computations, which are not disputed by plaintiff and which I accept as true for present purposes, their 34% stake in the B convertible allows them to control only .46% of any vote in which all classes of stock participate. Even if they were to convert their B convertible into shares of common stock at the maximum conversion ratio, they would only control approximately 4% of such a vote. Moreover, when the A preferred and the B convertible shares are entitled to vote together for the election of two directors, the B convertible controls approximately 5.6% of the vote. Thus, in defendant's view, since they do not possess 10% control over most corporate decisions, particularly those involving the election of directors, they should not

---

**1.** This definition of "beneficial owner" actually appears in section 16(a), 15 U.S.C. § 78p(a), although section 16(b) incorporates it by employ- ing the referential phrase "such beneficial owner." *See Ellerin v. Massachusetts Mutual Life Insurance Co.,* 270 F.2d 259, 262 (2d Cir.1959).

be subject to liability as beneficial owners under section 16(b).

The most significant obstacle to the moving defendants' argument is the statutory language itself. Had Congress intended to enact a statute codifying defendants' interpretation, it could have defined "beneficial owner" as an individual who controls over 10% of all outstanding voting shares. But instead, the statute speaks of "classes": a person who owns more than 10% of any class of any equity security is subject to liability under section 16(b).

In examining what Congress meant by the phrase "class of any equity security," the Second Circuit in *Ellerin v. Massachusetts Mutual Life Insurance Co.*, 270 F.2d 259 (1959), explained that it should be assigned its ordinary meaning in the legal and financial worlds. The question in *Ellerin* was whether two series of a nominal class of preferred stock should be considered part of the same "class" for purposes of section 16(b). Each series had different dates of issuance, listing and registration, annual dividend rates, redemption prices, and sinking fund requirements. However, they shared almost identical voting rights, the same preference as to dividend and liquidation distributions, and the same par value. In addition, both series lacked pre-emptive and conversion rights. The court noted these characteristics, but did not engage in an in-depth comparison of the two series to see if they belonged to the same class. Instead, it took a more commonsensical approach to the problem, stating that:

> the very absence of congressional direction or guidance suggests that the Congress thought the meaning of the phrase 'class of any equity security' was reasonably clear and it was using familiar terms in their ordinary and generally accepted sense according to the common usage of the day in the legal and financial worlds.

270 F.2d at 262; *see also Schaffer*, 1996 WL 148335, *3. Since "the terms 'class' and 'series' were familiar terms in common usage" at the time of the passage of the 1934 Act, the court concluded that "a 'class' is not a 'series' within the meaning of section 16." *Id.* at 263. Hence, the court considered the two series to constitute a single class of security.

Despite the clear language of section 16 and the Second Circuit's interpretation of that language in *Ellerin*, the moving defendants still argue that designating the B convertible as a separate class of securities would contravene legislative intent. They note, quite correctly, that concerns over voting influence prompted Congress to subject beneficial owners to liability under section 16(b). Thus, the moving defendants would have the B convertible be considered part of the same class as the other voting securities. This grouping is necessary, say the moving defendants, because it reflects more accurately the control they possess over corporate decisions. Since that control would rarely exceed the requisite 10%, the moving defendants argue that they do not fall within the ambit of section 16(b). At bottom, then, it is defendant's view that overall voting control, rather than control within a nominal class, is what subjects an owner of securities to liability under section 16(b).

It is true that Congress meant in section 16(b) to prevent short-swing speculation by individuals who might acquire inside information by virtue of their influence in the corporation. But the moving defendants press this purpose too far in asserting that voting control is the "*sine qua non* of a class" under section 16(b). Reply Brief at 15. Congress specifically chose not to define "beneficial owner" in general, non-specific terms of influence or control. Instead, it chose to enact a prophylactic rule, *see Foremost–McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 251, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976), one which has as its chief virtue ease of application. Courts are thus told to examine whether or not the individual in question owns 10% or more of a class of security. If so, the individual is a beneficial owner and subject to liability under 16(b), whether or not he exerted actual control over the corporation, or in fact abused his control for insider trading purposes. *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 595, 93 S.Ct. 1736, 1745, 36 L.Ed.2d 503 (1973) (section 16(b) requires insiders to surrender profit from short-swing trading "without proof of actual abuse of insider informa-

tion, and without proof of intent to profit on the basis of such information"). The Second Circuit recognized Congress' desire for such a definite rule in *Ellerin* when it stated:

> [W]e think it proper to say at the outset that the true guide to what is meant by an "insider" must be found in the definition in the statute itself, and that any attempt to substitute a different evaluation based either upon a close examination of the terms and conditions of particular issues, which would fluctuate and require reappraisal according to the facts of each case, or upon far-fetched inferences drawn from rules and regulations of the SEC not *in pari materia can only result in uncertainty and confusion in an area of the law where the statute contains internal evidence that the Congress intended to establish a certain and self-sufficient test.*

270 F.2d at 261 (emphasis added). In this Court's more recent words, the 10% requirement is a " 'crude rule of thumb' [which] 'embodies a rather uncommon regulatory mechanism' to prevent insider trading." *Schaffer*, 1996 WL 148335, *5, citing and quoting *Blau v. Lamb*, 363 F.2d 507 (2d Cir.1966). "It might be said that Congress decided in order to throw out the bathwater that the baby had to go too." *Blau*, 363 F.2d at 515.

Thus, the fact that a shareholder who owns more than 10% of a nominal class of securities does not exert meaningful control over corporate decisionmaking does not mean he is exempted from liability under section 16(b). A simple example will make the point: if a corporation has 100 shares of a single class of common stock outstanding and 2 shareholders, one who owns 89 shares and the other who owns 11, the 11% minority shareholder is subject to liability under section 16(b) despite the fact that he exerts no degree of control over corporate decisionmaking and cannot truly be seen as an insider. "[This] anomaly ... is built into the statute", 5 Louis Loss & Joel Seligman, *Securities Regulation* at 2417 (3d Ed.1990), and reflects the primary drawback associated with *per se* rules of this sort.

Of course, the rule has a corresponding benefit. Its clear mandate is easy for shareholders to follow and courts to apply. The moving defendants' proposed rule, on the other hand, would create needless uncertainty in this area of the law. They propose that all nominal classes which vote together on various subjects be considered part of a single class, so as to account for any voting dilution which results from such a scheme. The problem is that many corporations, like New Valley, have several classes of stock, each with separate voting rights. Some classes vote on all matters, others vote on some, and still others vote on none. The task of determining which shareholders exert 10% control over a sufficient number of matters to be formally considered insiders for the purposes of section 16(b) would inject the courts into a maze of guesswork and confusion, the very maze Congress sought to avoid in promulgating a bright-line standard.

*Chemical Fund, Inc. v. Xerox Corp.*, 377 F.2d 107 (2d Cir.1967), another Second Circuit case cited by the moving defendants, does not lead to a contrary conclusion. At issue in that case was whether a 10% holder of convertible debentures was subject to section 16(b) liability. As a debt holder, the defendant did not possess voting rights. However, the debentures were convertible into equity common stock. Upon such conversion, the defendant would own 2.74% of the corporation's outstanding voting equity. The court of appeals held that the "[d]ebentures [were] not a class by themselves" and that the "total percentage of common stock which a holder would own following a hypothetical conversion ... is the test of liability under section 16(b)." 377 F.2d at 110. The court reasoned:

> [T]here is no reason whatever to believe that any holder of any Convertible Debentures would, by reason of such holding, normally have any standing or position with the officers, directors or large stockholders of a company so that such holder of Debentures would be the recipient of any inside information. There is no provision which gives a holder of the Debentures any standing beyond that of a creditor entitled to certain specified payments of interest at stated intervals, and possessing numerous rights all of which are specifically spelled out in the trust indenture

pursuant to which the Debentures were issued.

*Id.* at 111 (footnote omitted). The moving defendants place heavy reliance on the rule and reasoning of *Chemical Fund* in arguing that their diluted voting power in the corporation places them beyond the reach of section 16(b). But this is not a case like *Chemical Fund.* The moving defendants own convertible equity securities which have voting rights independent of any conversion. They thus fall within the framework devised by the SEC in the following release, a release which codified and expanded upon the ruling in *Chemical Fund:*

> In contrast to convertible debt, a security that is an equity security in its own right, as well as on account of a conversion feature, would require a double calculation. For example, if a class of voting preferred stock registered under Section 12 is convertible into Section 12 common stock, the beneficial owner of the preferred stock is deemed the owner of both the preferred stock and the underlying common stock. Accordingly, the ten percent holder calculation must be performed with respect to the preferred stock and the common stock separately. If the convertible preferred stock is non-voting, the preferred stock is not considered a separate class of equity for purposes of the ten percent holder calculation, because Rule 13d.3(d)(1) excludes non-voting securities; therefore, the beneficial owner of the non-voting preferred stock, like a holder of convertible debt, performs the ten percent holder calculation only with respect to the underlying common stock.

Ownership Reports and Trading by Officers, Directors and Principal Security Holders,

Exchange Act Release No. 28,869, 48 SEC Dock. 216, 220 n. 6, Fed.Sec.L.Rep. (CCH) ¶ 84,709 (Feb. 8, 1991). In the SEC's view then, convertible securities which are voting equity securities prior to conversion should be considered a separate class for the purposes of section 16(b), and thus subject to a separate 10% ownership calculation.

The SEC clearly shares the view of the *Ellerin* court that the word "class" in section 16(b) should be given its ordinary and generally accepted meaning, rather than the one suggested by the moving defendants, which places undue emphasis on the overall voting power vested in a holder of the security. *See Schaffer,* 1996 WL 148335, *3. I also share that view. Applying the *Ellerin* rule to the facts of this case, I do not hesitate in concluding that the B convertible is a separate class within the meaning of section 16(b). It is distinct in all relevant respects from the other New Valley securities: it has different voting rights and powers, different redemption features, different liquidation and dividend preferences, and a unique conversion feature. These differences distinguish the nominal classes of securities at bar from the two series of securities in *Ellerin,* which shared the same voting rights, liquidation and dividend preferences, and lack of redemption and conversion features.[2] The only feature that the B convertible shares with the other two classes is the one highlighted by the moving defendants: its ability to vote with them on matters of general corporate concern. But that does not make the three groups of New Valley securities, each with its own unique features, a single "class" as the word is ordinarily used in the financial and legal communities.

---

**2.** Defendants rely heavily on the district court's consideration of the *Ellerin* case, where the court stated that "[f]or the purpose of determining whether an issue of stock is a separate class, voting rights are of vital importance." *Ellerin v. Massachusetts Mutual Life Insurance Co.,* 167 F.Supp. 71, 78 (S.D.N.Y.1958). The court went on to explain that "if voting rights are identical, that would constitute a persuasive consideration that the stock should be treated as one 'class.'" *Id.*

Here, as noted, the three separate classes do not share identical voting rights. Moreover, even if they did, the district court in *Ellerin* also

relied on the corporation's certificate of incorporation, Ohio's statutory scheme, and the identical preferences of the two series in concluding that they were part of the same class. *See id.* at 78–79. In the case at bar, none of these factors militate in favor of grouping the B convertible together with the other nominal classes; if anything, the factors point the other way.

Finally, it is the Second Circuit's analysis in *Ellerin,* not the district court's, which is binding upon this Court. I have adhered to that analysis in this opinion without deviating from the logic of the district court's discussion.

Having said all this, it bears emphasis that "corporate labels are not necessarily binding on the court." *Ellerin,* 270 F.2d at 265. The proper inquiry, as the Second Circuit put it in *Ellerin,* is whether there is a "sham characterization": that is, whether the differences that exist between the securities are "commonly found" among securities of the same class.[3] *Id.* Here, unlike *Ellerin,* the differences are significant and meaningful—differences of this sort generally form the dividing line between equity classes in a corporation. I thus conclude that the B convertible stock constitutes what is generally seen as a separate "class" of security in the legal and financial worlds.

## IV.

For the above reasons, Freund and Goldsmith's motion to dismiss is denied.

Counsel for the parties are directed to appear at 500 Pearl Street, Courtroom 17C for a status conference on September 20, 1996 at 2:30 p.m.

It is SO ORDERED.

**3.** I should note in this regard that I decline plaintiff's invitation to incorporate the section 12(g)(5) definition of "class" into section 16. Section 12(g)(5) defines "class" as including "all securities of an issuer which are of substantially similar character and the holders of which enjoy substantially similar rights and privileges." 15 U.S.C. 781(g)(5). The section goes on to state that the definition is "for the purposes of this provision." Thus, although section 16 applies to "securities registered pursuant to [section 12]" the definition in section 12(g)(5) should not be read into that provision. *See Schaffer,* 1996 WL 148335, *3; *Ellerin,* 270 F.2d at 265 (holding that the "substantial similarity" test of former section 15 should not apply to section 16(b) because it contained the restrictive language, "for the purposes of this subsection").