**Richard MORALES, Plaintiff,**

**v.**

**NEW VALLEY CORPORATION, Harry I. Freund and Jay S. Goldsmith, Defendants.**

**No. 95 Civ. 1246(CSH).**

United States District Court, S.D. New York.

March 20, 1998.

David Lopez, Southampton, NY, for Plaintiff.

Laurence V. Senn, Jr., Mudge, Rose, Guthrie, Alexander & Ferdon, New York, NY, Michael L. Hirschfeld, Milbank, Tweed, Hadley & McCloy, New York, NY, for New Valley Corp.

Jay G. Strum, Kaye, Scholer, Fierman, Hays & Handler, New York, NY, for Harry I. Freund.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Plaintiff Richard Morales brings this action pursuant to section 16(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78p(b), seeking the disgorgement of short-swing profits earned in transactions in Class B cumulative convertible preferred stock ("B Preferred") of New Valley Corporation. Defendants Harry I. Freund and Jay S. Goldsmith move for summary judgment pursuant to Rule 56, Fed. R.Civ.P., and Morales cross-moves for summary judgment.

### Background

Many of the facts of this case are set out in the prior opinions of this Court, familiarity with which is assumed. *See Morales v. New Valley Corp.,* 936 F.Supp. 119, 120–22 (S.D.N.Y.1996) (denying defendants' motion to dismiss); *see also Morales v. New Valley Corp.,* 968 F.Supp. 139, 142 (S.D.N.Y.1997) (denying plaintiff's motion to amend the complaint). I summarize only those facts that are pertinent to these motions.

Defendants are two of the three owners and officers (along with Kenneth S. Grossman) of Veritovtrade, "a privately held company engaged in the business of investing in the securities of distressed corporations." Lopez Aff. Ex. 2 (joint Schedule 13D filed by defendants, Grossman and Veritovtrade). New Valley was one such distressed corporation, having entered Chapter 11 bankruptcy in late 1991. Plaintiff is a New Valley shareholder.

Edward S. Gutman, J & S Investments & Company, and Spear Leeds & Kellogg ("SLK") (collectively, the "Holders") all held B Preferred in New Valley. On March 14, 1994, Veritovtrade executed an Equity Appreciation and Advisory Agreement (the "Agreement") with the Holders, in which

Veritovtrade agreed to "use its best efforts to maximize the value received by the Holders in respect [of] the B Preferred under any POR [Plan of Reorganization] confirmed by the Bankruptcy Court." Lopez Aff. Ex. 1. In exchange, Veritovtrade would be compensated based upon the value of (or proceeds received from the sale of) the B Preferred; Veritovtrade was also granted a right of first refusal over any transfer or encumbrance of the Holders' B Preferred shares. *See id.* On the date of execution of the Agreement, defendants each owned only 1,250 shares of B Preferred, *see id.* Ex. 2, but the Holders collectively held 27.86 percent of the B Preferred issued by New Valley.[1] *See id.* Ex. 9.

Filings with the SEC reveal that following the execution of the Agreement, between March 28 and May 4 defendants each bought 49,250 shares of B Preferred at prices ranging from $.60 to $3.50 per share. *See id.* Ex. 5. Between September 12 and September 23, each defendant sold 48,394 shares at prices ranging from $19.875 to $22.875 per share; defendants then each sold their remaining 2,106 shares on October 5 at $7.20 per share. *See id.* Ex. 6–8. Each of the 49,250 shares that each defendant purchased after executing the Agreement can be matched to a highly profitable sale occurring less than six months after its purchase; defendants received returns well in excess of one million dollars.

Section 16(b) of the 1934 Act requires any "beneficial owner, director, or officer" of an issuer to disgorge all profits realized from purchases and sales of securities of the issuer "within any period of less than six months." 15 U.S.C. § 78p(b). Section 16(a) defines a "beneficial owner" as one who "directly or indirectly" owns "more than 10 per centum of any class of any equity security (other than an exempted security)" which is registered under § 78l. *Id.* at § 78p(a).

It is quite clear that defendants realized substantial profits from the purchase and sale of New Valley B Preferred within six months. It is also undisputed that neither defendant was an officer or director of New Valley Corporation. The question presented on these cross motions for summary judgment is whether the defendants were "beneficial owners" of more than 10 percent of New Valley B Preferred. If they were, as plaintiff contends, they must disgorge their profits; § 16(b) requires no further proof. Defendants argue that they were never "beneficial owners" under the relevant statute and regulations, and that plaintiff is entitled to no relief.

### Discussion

### I. Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party resisting summary judgment must show a dispute of material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, summary judgment is warranted where, "after adequate time for discovery ... [the nonmoving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In the present action, summary judgment is appropriate if there is no genuine issue of material fact underlying the legal question of whether defendants were beneficial owners of New Valley B Preferred at the time of their short-swing transactions.

### II. Section 16(b)

Section 16(b) was intended to "prevent[] the unfair use of information which may have been obtained by such beneficial owner, di-

---

1. According to the Schedule 13D filed jointly by the Holders on March 14, 1994, SLK held 291,-498 shares (10.44%); J & S held 216,200 shares (7.75%), and Gutman held 269,951 shares (9.67%).

rector, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b). Strict liability and disgorgement were imposed by § 16(b) "to remove any temptation for insiders to engage in transactions which 'may serve as a vehicle for the evil which Congress sought to prevent-the realization of short-swing profits based upon access to inside information.'" *Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316, 320 (2d Cir.1998) (quoting *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973)).

As the Second Circuit recently stated, "[s]ection 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition. 'Such is the price of easy administration.'" *Id.* (quoting Robert Charles Clark, Corporate Law 295–96 (1986)). This analysis assumes, not without justification, that it is easier to identify a statutory insider than a corrupt heart. But while officers and directors are identified by name in annual reports, the beneficial owner is more elusive, often lurking in relative obscurity.

### A. Beneficial Ownership

In 1991, the SEC issued new rules changing the definition of beneficial owner under § 16 of the 1934 Act. Rule 16a–1(a)(1) now states that "for purposes of determining whether a person is a beneficial owner of more than ten percent of any class [of securities] ... the term 'beneficial owner' shall mean any person who is deemed a beneficial owner under section 13(d) of the [1934] Act and the rules thereunder." 17 C.F.R. § 240.16a–1(a)(1).[2]

Rules promulgated under § 13(d) provide the applicable definition, stating that

a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,

(2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

Rule 13D–3(a), 17 C.F.R. § 240.13d–3(a).

This much is straightforward. But there is an added wrinkle to this definition: § 13(d), 15 U.S.C. § 78m(d), states in part that if "two or more persons act as a ... group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person'" that may itself be a beneficial owner. *Id.* at § 78m(d)(3).[3] Veritovtrade is a "group" under this definition, its stated purpose being to invest in corporate securities.[4] However, defendants, Grossman and Veritovtrade did not directly own more than ten

**2.** Section 16 actually requires a "two-tier" analysis of beneficial ownership. As the SEC explained when adopting the new rules, "[t]he section 13(d) definition of beneficial ownership is used only to determine status as a ten percent holder; once status is determined, the reporting and short-swing profit provisions of section 16 apply only to those securities in which the insider has a pecuniary interest." Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Rel. No. 34–28869, 56 Fed. Reg. 7242, 7244 (1991). The first-tier definition of beneficial ownership is found in Rule 16a–1(a)(1); the second-tier definition is stated in Rule 16a–1(a)(2), 17 C.F.R. 240.16a–1(a)(2). *See Strauss v. American Holdings, Inc.*, 902 F.Supp. 475, 478 (S.D.N.Y.1995). As for the second tier of the analysis, there is no question that defendants had a pecuniary interest in the B Preferred shares that they purchased and sold; they owned those shares directly. It is only the possible *status* of defendants as beneficial owners that must be determined, and therefore only the

§ 13(d) analysis (and not Rule 16a–1(a)(2)) is applicable to the present motion.

**3.** *See also* Rule 13d–5, 17 C.F.R. § 240.13d–5. In words that nearly mirror the statute, the Rule states that

When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership ... as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d–5(b)(1).

**4.** Defendants, Grossman and Veritovtrade recognized their group status; they stated in a Schedule 13D filing that they were "filing this statement jointly as they may be deemed to be a 'group' within the meaning of Section 13(d)(3)" of the 1934 Act. Lopez Aff. Ex. 2.

percent of the B Preferred. If defendants were beneficial owners of more than ten percent of the B Preferred, they became so by operation of the Equity Appreciation and Advisory Agreement they executed with the Holders.

### B. The Equity Appreciation and Advisory Agreement

Under the relevant statute and Rules, the Agreement could have resulted in defendants' beneficial ownership of the Holders' B Preferred shares in two distinct ways. First, defendants could have become beneficial owners of the Holders' shares if the Agreement conferred upon defendants either voting or investment power with regard to those shares. *See* Rule 13d–3(a). Second, defendants could have become beneficial owners of the shares if the Agreement had the effect of making Veritovtrade (and defendants) and the Holders a "group" under § 13(d)(3).

Plaintiff identifies many clauses in the Agreement that he argues combine to make Veritovtrade and the Holders a § 13(d)(3) group. Under "Representations of Holders," ¶ 1(d) states that

> Holders will not sell, pledge, transfer or apothecate the B Preferred owned by them without providing Veritovtrade with the right of first refusal to purchase same for the same price and terms as offered to Holders. Veritovtrade shall have two business days from the date it receives written notice of a proposed sale from a Holder to notify the Holder that it desires to exercise this right of first refusal.

Lopez Aff. Ex. 1 ¶ 1(a).

Under "Representations of Veritovtrade," Veritovtrade contracted to

> use its best efforts to maximize the value received by the Holders in respect [of] the B Preferred under any POR confirmed by the Bankruptcy Court, including but not limited to: (i) meeting with and consulting with creditors, parties-in-interest, interested third parties and management representatives to negotiate and structure the terms of a POR; (ii) communicating the terms of the plan and changes thereto to the Holders; (iii) communicating with the financial press in connection with further-

ing the POR process; (iv) advising Holders as to strategy and tactics in maximizing the value of Holders' B Preferred.

*Id.* at ¶ 2(a). Veritovtrade further agreed to "use its best efforts to obtain voting control for the Holders of the common stock of New Valley as reorganized if such voting control maximizes the value paid to the Holders in respect of their B Preferred." *Id.* at ¶ 2(c).

As compensation for these services, the Holders agreed to compensate Veritovtrade by sharing the profits from the B Preferred, the precise amount being "based upon the greater of (x) the value of the B Preferred as set forth in the POR for New Valley confirmed by the Bankruptcy Court; or (y) the actual proceeds received by Holders from the sale or other disposition of Holders' interest in the B Preferred." *Id.* at ¶ 3.

The Holders and Veritovtrade further agreed to waive conflicts of interest, *see id.* at ¶ 4, and accept specific enforcement of the agreement, *see id.* at ¶ 6. Finally, the parties agreed that "[n]o party to this Agreement shall take any action, or fail to take any action directly or indirectly, designed to frustrate the purpose of this Agreement, by way of informal understanding, legal agreement or otherwise." *Id.* at ¶ 8.

█ It is clear that the Agreement transferred neither voting control nor investment control of the B Preferred to defendants. While it constructed an advisory role for Veritovtrade, Veritovtrade did not acquire any voting authority with regard to the Holders' B Preferred.

The only investment power held by Veritovtrade under the terms of the agreement was the right of first refusal. However, a "right to acquire" securities is only counted toward the calculation of beneficial ownership when that right is exercisable within "sixty days." *See* Rule 13d–3(d)(1)(i), 17 C.F.R. § 240.13d–3(d)(1)(i). As Veritovtrade and defendants had no control over when the right of first refusal could be exercised, this does not amount to investment power under Rule 13d–3(a). A close consulting relationship, even when combined with a possible future acquisition of stock, is insufficient to bring a defendant within the ambit of Rule

13d–3. *See Transcon Lines v. A.G. Becker Inc.*, 470 F.Supp. 356, 374–75 (S.D.N.Y.1979).

■ The remaining question, then, is whether the Agreement resulted in the union of defendants and the Holders in a § 13(d)(3) group. In *Wellman v. Dickinson*, 682 F.2d 355 (2d Cir.1982), the Second Circuit stated that § 13(d)(3) "contains no requirement . . . that the members be committed to acquisition, holding, or disposition on any specific set of terms. Instead, the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Id.* at 363. It is often difficult to prove the existence of an express or implied agreement between members of an alleged group. In this case, however, the agreement was made in writing and submitted to the SEC. The only question is whether the Agreement should be construed as being "for the purpose of acquiring, holding, or disposing of securities of an issuer," as that phrase is used in § 13(d)(3) of the 1934 Act, 15 U.S.C. § 78m(d)(3).

The Agreement has several clauses, set out above, that relate to the acquisition, holding and disposing of stock. The only clause related to the acquisition of securities is ¶ 2(c), where Veritovtrade promises to use its best efforts to obtain voting control of (reorganized) New Valley common stock if this will maximize the value of the B Preferred. *See* Lopez Aff. Ex. 1 ¶ 2(c). But while this states a clear (if conditional) intent to acquire stock, it is not the stock at issue in the present case. Based on this clause, defendants and the Holders could have become a group for the purpose of calculating beneficial ownership not of B Preferred, but only of some future class of common stock of New Valley. The Agreement does not provide any evidence of a concerted plan between the Holders and defendants to acquire additional shares of B Preferred.

The Agreement does, however, contain explicit agreements concerning the holding and disposing of B Preferred. The most significant are Veritovtrade's right of first refusal and share of profits from the appreciation of the B Preferred. These clauses compel the conclusion that defendants (through Veritovtrade) and the Holders became a group under § 13(d)(3).

The Holders were in possession of 27.86 percent of the shares of B Preferred issued by New Valley. When Veritovtrade acquired a right of first refusal, this joined the Holders and defendants in a group for the purpose of holding B Preferred; Holders were required to either hold the stock themselves, or offer it to defendants. The shares would be retained by the group if defendants so desired. And by agreeing to share profits from the appreciation of the B Preferred, defendants and the Holders cemented the union of their interests; they would hold the B Preferred, and share any profits from its disposition.

Defendants argue that the right of first refusal and waiver of conflicts of interest in the Agreement are evidence that defendants and the Holders had widely divergent interests. But the Agreement's recognition that Veritovtrade and the Holders might not always make identical investment decisions cannot mask the fact that the Agreement constituted an explicit agreement "for the purpose of . . . holding [and] disposing of" New Valley B Preferred. 15 U.S.C. § 78m(d)(3). And although the parties might not always march in lockstep, they agreed that they would take no action "designed to frustrate the purpose of this Agreement." Lopez Aff. Ex. 1 ¶ 8. The purpose of the Agreement was to hold, dispose of, and profit from the B Preferred, and this purpose was shared by defendants and the Holders.[5] Defendants formed a § 13(d)(3) group with the

---

**5.** Defendants also argue that the fact that defendants bought some of their shares from the Holders is evidence that no group had been formed. This argument is unavailing. If the Holders knew that large profits would soon accrue to the B Preferred shares, then they transferred these profits intentionally to defendants; this may have been a misguided attempt to increase defendants' compensation under the Agreement. If, however, the Holders were unaware that the price of the B Preferred was about to increase, then defendants may have exploited the Holders' ignorance. The circumstances, however, are immaterial. There is ample evidence that defendants and Holders formed a § 13(d)(3) group.

Holders, and became beneficial owners of more than ten percent of the B Preferred.

Section 16(b) is admittedly a blunt instrument, not given to equitable adjustments in its application. In determining the reach of the statute, one can become absorbed in the counting of shares and days. But it is important not to lose sight of its purpose: to prevent insider trading. And in this case, defendants were not only beneficial owners, they were true insiders. They were advisors to a very large block of shareholders in a distressed corporation, and they agreed to become very familiar with that corporation[6] in order to serve those shareholders. They intended to play a large role in the reorganization of the company. All of this, without more, would not make them beneficial owners of any shares. But defendants also held a right of first refusal and a share in the profits in hundreds of thousands of shares of B Preferred. And they utilized their insider position to buy and sell shares of the corporation at a huge profit in a very short time.

This would seem to be precisely the behavior that § 16(b) was intended to deter.[7]

## C. Computation of Damages

■ Plaintiff correctly asserts that the "lowest [price] in, highest [price] out" rule is the correct method for computing § 16(b) damages. *See Mayer v. Chesapeake Insurance Co.*, 877 F.2d 1154, 1164 (2d Cir.1989) (citing *Smolowe v. Delendo Corp.*, 136 F.2d 231, 239 (2d Cir.1943)). Where, as here, the lowest price at which shares were sold exceeds the highest price at which shares were purchased, one may reach the proper measure of damages simply by subtracting the total cost of all the shares from the total proceeds generated by the shares. The following table represents purchases and sales made by the defendants (who bought and sold shares in equal numbers at equal prices at equal times):

*PURCHASES*

| date | # shares | | price | | |
|------|----------|---|-------|---|---|
| 3/28/94 | 6,500 | @ | $0.60 | = | $ 3,900 |
| 4/8/9 | 44,250 | @ | $1.98 | = | $ 8,415 |
| 4/13/94 | 20,500 | @ | $2.25 | = | $ 46,125 |
| 5/4/94 | 18,000 | @ | $3.50 | = | $ 63,000 |
| | | TOTAL COST | | = | $121,440 |

*SALES*

| date | # shares | | price | | |
|------|----------|---|-------|---|---|
| 9/12/94 | 834 | @ | $22.875 | = | $ 19,077.75 |
| 9/13/94 | 2,200 | @ | $22.00 | = | $ 48,400 |
| 9/14/94 | 100 | @ | $20.75 | = | $ 2,075 |
| 9/14/94 | 2,800 | @ | $19.875 | = | $ 55,650 |
| 9/14/94 | 2,800 | @ | $19.95 | = | $ 55,860 |
| 9/16/94 | 600 | @ | $21.125 | = | $ 12,675 |
| 9/19/94 | 60 | @ | $22.50 | = | $ 1,350 |
| 9/19/94 | 6,000 | @ | $22.35 | = | $ 134,100 |
| 9/19/94 | 10,500 | @ | $22.00 | = | $ 231,000 |
| 9/20/94 | 20,000 | @ | $20.00 | = | $ 400,000 |
| 9/23/94 | 2,500 | @ | $20.00 | = | $ 50,000 |
| 10/5/94 [8] | 856 [9] | @ | $7.20 | = | $ 6,163.20 |
| | | TOTAL PROCEEDS | | = | $1,016,350.95 |

**6.** Their contractual duties included "meeting with and consulting with creditors, parties-in-interest, interested third parties and management representatives." Lopez Aff. Ex. 1 ¶ 2(a).

**7.** As the Supreme Court has noted, "[i]n deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent." *Kern County Land Co.*, 411 U.S. at 594 (quoted in *Gwozdzinsky v. Magten Asset Management Corp.*, 106 F.3d 469, 471 (2d Cir.1997)).

Subtracting total costs from total proceeds yields a profit of $894,910.95 for each defendant, which must be disgorged to the corporation.

The only remaining question is whether pre-judgment interest should be awarded. This is not an insignificant question, as these profits were recognized more than three years ago. Pre-judgment interest may be awarded in the Court's discretion. *See Schaffer v. Dickstein & Co.*, 1997 WL 292005 (S.D.N.Y.1997) (denying prejudgment interest in the absence of bad faith or other inequitable conduct). Defendants in this case made full disclosure of their trading to the SEC in Schedule 13D filings, and may not have realized that, on a proper construction of the statute, they were beneficial owners of the B Preferred shares of the Holders. Accordingly, pre-judgment interest is denied.

### Conclusion

For the foregoing reasons, and as there is no genuine issue of material fact, defendants' motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted. Judgment is entered against Harry I. Freund and Jay S. Goldsmith, each of whom must disgorge profits in the amount of $894,910.95 to New Valley Corporation.

It is SO ORDERED.

---

**8.** This date is more than six months after the *first* shares in the "Purchases" table were acquired; however, the shares sold on this date can be matched to shares purchased less than six months before this date.

**9.** Although 2,106 shares were sold by each defendant on this date, 1,250 of those shares are considered to be those that defendants owned for more than six months before selling any shares.