**Richard MORALES, Plaintiff,**

v.

**NEW VALLEY CORPORATION, Harry I. Freund and Jay S. Goldsmith, Defendants.**

**No. 95 Civ. 1246 (CSH).**

United States District Court, S.D. New York.

June 27, 1997.

---

David Lopez, Southampton, NY, for Richard Morales.

Michael L. Hirschfeld, Milbank, Tweed, Hadley & McCloy, New York City, for New Valley Corp.

Jay G. Strum Kaye, Scholer, Fierman, Hays & Handler, New York City, for Harry I. Freund, Jay S. Goldsmith.

*MEMORANDUM AND ORDER*

HAIGHT, Senior District Judge.

This matter is currently before the Court for consideration of plaintiff's motion to amend his complaint to add a new party defendant, Kenneth S. Grossman, and a new claim for relief under section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b), applicable to both Grossman and the existing defendants. Defendants Goldsmith and Freund oppose the motion, arguing that plaintiff's proposed amendment fails to state a claim under § 16(b), or in the alternative, is time-barred. For the reasons set forth below, plaintiff's motion is denied.

I.

Federal Rule of Civil Procedure 15(a) directs that leave to amend "shall be freely given when justice so requires." "[T]his mandate is to be heeded." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Accordingly, leave to amend should normally be granted under Rule 15(a) absent:

> "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

amendment, futility of the amendment, etc."

*Id.*; *see also Health-Chem Corp. v. Baker,* 915 F.2d 805, 809 (2d Cir.1990) (holding that leave to amend should be denied where proposed amendment has no merit); *State Teachers Retirement Board v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981) ("Reasons for proper denial of leave to amend include ... futility of the amendment."). Defendants essentially object to the proposed amendment on the ground that it would be futile.

Since defendants' objection is the functional equivalent of a motion to dismiss the claim under Rule 12(b)(6), Fed.R.Civ.P., plaintiff's proposed amendment should be evaluated under the same standards. *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991). Accordingly, this court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Plaintiff's motion to amend should be denied on the grounds of futility "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). To that end, the Court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986), and construe them in a light most favorable to the plaintiff. *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir. 1991). In deciding this motion, the Court may consider the pleadings and any exhibits attached thereto, documents incorporated by reference in the pleadings, matters subject to judicial notice, *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993), and documents filed with the SEC which plaintiff relied upon in composing his complaint. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

## II.

Plaintiff brings this action pursuant to § 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b), which requires that an officer, director, or "beneficial owner of more than 10 per centum of any class of any equity security" disgorge and return to the corporation profits realized by that individual through the purchase and sale, or sale and purchase, of the equity security within a period of less than six months. 15 U.S.C. § 78p(a); *see also Morales v. New Valley Corporation,* 936 F.Supp. 119, 122 (S.D.N.Y. 1996). Plaintiff's current complaint alleges that Freund and Goldsmith were members of a "group," as that term is defined in Section 13(d), 15 U.S.C. § 78m(d),[1] the members of which, in the aggregate, were beneficial owners of more than 10% of the outstanding Class B cumulative convertible preferred stock of New Valley (hereinafter referred to as "preferred stock").[2] The gravamen of plaintiff's current complaint is that the defendants, while members of this group, earned a short-swing profit from the purchase and sale of New Valley preferred stock that must be returned to New Valley pursuant to § 16(b).

In his current motion, plaintiff proposes to add a new cause of action under § 16(b) against Freund, Goldsmith, and another member of the "group", one Kenneth S.

1. Section 13(d)(3), 15 U.S.C. § 78m(d)(3), provides that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."

2. The members of this "group" are alleged to be the defendants, Kenneth S. Grossman, a company called Veritovtrade (owned in equal parts by the defendants and Grossman), Edward S. Gutman, J & S Investments Company (a New Jersey general partnership) and Spear, Leeds & Kellogg (a registered broker-dealer). Plaintiff also claims that the "group" concealed its existence by failing to file the appropriate forms with the SEC. Freund and Goldsmith deny that they were members of a group and that a group existed.

Grossman, based on the assignment of certain rights to Freund, Goldsmith and Grossman, (hereinafter referred to collectively as "the defendants"), by their wholly owned company, Veritovtrade.

On March 14, 1994, Veritovtrade executed an Equity Appreciation and Advisory Agreement with Spear, Leeds & Kellogg, J & S Investments & Company and Edward S. Gutman (hereinafter referred to as "the Holders"). Under this agreement, Veritovtrade agreed to provide financial advisory services in connection with New Valley's preferred stock, in exchange for the right to receive certain performance-related fees equal to a percentage of the appreciation of the New Valley preferred stock owned by the Holders. Several months later, on May 4, 1994, Veritovtrade executed an Assignment Agreement, pursuant to which it assigned its rights and obligations under the Equity Appreciation and Advisory Agreement to the defendants. Plaintiff alleges that within six months of the defendants' acquisition of this right to receive a performance-related fee, the Holders sold their stock at a profit, thereby generating performance-related fees for the defendants.

Plaintiff asserts a § 16(b) claim based on the foregoing factual scenario. His theory is that, by virtue of the Assignment Agreement, the defendants "purchased" beneficial ownership of New Valley preferred stock, or a derivative security based on New Valley preferred stock, since pursuant to that Agreement the defendants acquired the right to receive fees tied to the performance of New Valley preferred stock. Similarly, plaintiff alleges that the defendants "sold" their beneficial ownership of New Valley preferred stock, or a derivative security based on New Valley preferred stock, when the Holders sold their New Valley preferred stock at a profit, thereby generating fees for the defendants. Since the execution of the Assignment Agreement and the defendants' receipt of performance-related fees both occurred within a six month period, and while the defendants were members of the "group," plaintiff claims that defendants' performance-related fees are short-swing profits that must be disgorged to New Valley pursuant to § 16(b).

The defendants disagree; they argue, *inter alia*, that plaintiff's new claim fails to allege a "purchase and sale" within a six month period. Thus, the main issue presented by plaintiff's motion to amend is whether the acquisition of a right to receive a fee measured by the performance of an underlying equity security, and the subsequent receipt of that fee due to the sale of the underlying security, constitutes a "purchase and sale" under § 16(b). Since I answer this question in the negative, plaintiff's motion to amend is denied.

## III.

■ Section 16(b) was enacted to prevent insiders from exploiting information not generally available to others to secure quick profits. *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594, 93 S.Ct. 1736, 1744–45, 36 L.Ed.2d 503 (1973); *see also Blau v. Lamb*, 363 F.2d 507, 514 (2d Cir.1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967) (holding that "overriding purpose" of § 16(b) is to make it "unprofitable for insiders to engage in short-swing speculation."). Accordingly, the linchpin of § 16(b) liability is the "purchase and sale" or "sale and purchase" of any equity security by an insider within a six month period. The transaction described by plaintiff's amendment is clearly not the typical cash-for-stock transaction ordinarily considered a "purchase and sale." However, consistent with the remedial purpose of the statute, the definitions of "purchase" and "sale" under the statute are broad, and "reach many transactions not ordinarily deemed a sale or purchase." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. at 594, 93 S.Ct. at 1744.[3]

■ Plaintiff argues that Veritovtrade's assignment of its right to receive a perfor-

3. Under the statute, the terms "buy" and "purchase" are defined to "include any contract to buy, purchase or otherwise acquire." 15 U.S.C. § 78c(a)(12). Similarly, the terms "sale" and "sell" are defined to "include any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a)(13).

mance-related fee to the defendants constitutes a "purchase" of New Valley equity securities by the defendants. However, Veritovtrade is owned in equal parts by the defendants. As a result, the Assignment Agreement accomplished little of economic substance. Even prior to the assignment, the defendants were entitled to any performance-related fee earned by their wholly-owned company.

In similar circumstances, courts have held that a § 16(b) "purchase" or "sale" does not take place. *See, e.g., Blau v. Mission Corp.,* 212 F.2d 77, 80 (2d Cir.), *cert. denied,* 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954) (holding that the transfer of an issuer's stock between a corporation and its wholly-owned subsidiary is not a § 16(b) sale, but rather "a mere transfer between corporate pockets"; "[u]ntil going beyond the corporate forms, some new individuals entitled to share in the ultimate profits enter the picture there has been no real sale of stock."); *see also Lamb,* 363 F.2d at 526.

In *Lamb,* the individual defendant-insider, Edward Lamb, owned a controlling interest in two companies, referred to in the opinion as Enterprises and Industries. 363 F.2d at 525–26. Lamb and Enterprises were both insiders of a company named Air–Way. *Id.* at 513. The District Court held that Enterprises' acquisition of Air–Way stock from Industries constituted a § 16(b) purchase, for which Lamb and Enterprises were jointly liable. *Id.* at 525–26. The Court of Appeals reversed this finding, holding that

> [b]y virtue of Lamb's pervasive control over Industries and Enterprises, there was at most a token change in the insider's investment position when Air-way Common [stock] was transferred from Industries to Enterprises; Lamb indirectly owned this stock both before and after its transfer. Thus Lamb did not place himself where he could make any more advantageous use of inside information for speculative purposes than he could have before the transfer. Nor did the decision to transfer the Air–Way Common [stock] alter the nature of his investment, increase

or decrease the amount invested, or alter in any way the risks involved.

*Id.* at 526.

This analysis is equally applicable to the instant case. The assignment from Veritovtrade to the defendants resulted in no more than a token change in the investment position of the defendants. The change from indirect to direct ownership of the right to receive performance-related fees is insignificant in light of the fact that the defendants' direct ownership provided no more of an opportunity to take advantage of inside information than their indirect ownership prior to the assignment. *Cf. Magma Power Co. v. Dow Chemical Co.,* 1997 WL 23186, *6 (S.D.N.Y.1997) (noting that exercise of option, as opposed to purchase of option, is non-event for § 16(b) purposes since it "merely changes the form of beneficial ownership of the underlying security from indirect to direct without effecting a change in the opportunity for insiders to profit."). Accordingly, assuming *arguendo* that the right to receive performance-related fees measured by the appreciation in New Valley preferred stock is equivalent to owning New Valley preferred stock, the defendants did not make a § 16(b) "purchase" when they acquired the right from Veritovtrade, their wholly-owned company, by virtue of the Assignment Agreement.

Moreover, even if Veritovtrade was completely independent of the defendants, there would be no § 16(b) purchase by virtue of the defendants' acquisition of the right to receive fees measured by the appreciation of New Valley preferred stock. Plaintiff principally relies on the concept of "beneficial ownership" to support his argument that the defendants "purchased" New Valley preferred stock when they acquired the right to receive performance-related fees measured by New Valley preferred stock. This reliance is misplaced.

Under section § 16(b), the concept of "beneficial owner" has two distinct applications. *Strauss v. American Holdings, Inc.,* 902 F.Supp. 475, 478 (S.D.N.Y.1995). The first definition is used to determine who qualifies as an insider of an issuer by virtue of being the beneficial owner of more than ten per-

cent of any class of equity securities of the issuer. *See* 17 C.F.R. § 240.16a–1(a)(1). The second definition, and the one relevant for this motion, concerns reporting obligations under § 16(a) and liability under § 16(b). *See* 17 C.F.R. § 240.16a–1(a)(2).

For these latter purposes, beneficial owner means any person

> who directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities....

17 C.F.R. § 240.16a–1(a)(2). For example, under certain circumstances, an insider has a pecuniary interest in, and thus beneficial ownership of, securities of the issuer owned by: members of the insider's immediate family residing in the same household; a partnership in which the insider is a partner; and, a corporation of which the insider is a controlling shareholder. See 17 C.F.R. § 240.16a–1(2)(ii)(A)–(B), (iii). In addition,

> [a] performance-related fee, other than an asset-based fee, received by any broker, dealer, bank, insurance company, investment company, investment advisor, investment manager, trustee or person or entity performing a similar function....

creates an indirect pecuniary interest in the securities by which the fee is measured. 17 C.F.R. § 240.16a–1(a)(2)(ii)(C). Accordingly, under certain circumstances, an insider who receives a performance-related fee may be deemed to be the beneficial owner of the underlying securities. *Id.*

Once an insider is determined to be the beneficial owner of a security directly owned by another individual, any purchase and sale of that security within six months, by the insider or by the direct owner, can be attributed to the insider for the purposes of § 16(b) liability. For example, a purchase by the insider can be matched with a sale by the individual with direct ownership of the securities at issue to create § 16(b) liability. *See, e.g., Whiting v. Dow Chemical Co.,* 523 F.2d 680, 688–89 (2d Cir.1975) (insider considered beneficial owner of wife's stock such that sale by insider's wife is matched with purchase by insider to create § 16(b) liability); *Lamb,* 363 F.2d at 527 (purchases by corporation matched with the sales by that corporation's controlling shareholder to create § 16(b) liability for which both corporation and controlling shareholder are jointly liable since both corporation and controlling shareholder were insiders).

■ In addition, an insider who is the beneficial owner of another individual's securities can be held liable under § 16(b) for that individual's purchase and sale of the security within six months. *See, e.g., Blau v. Lehman,* 286 F.2d 786, 791 (2d Cir.1961), *aff'd,* 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962) (insider who was partner in investment bank held to be beneficial owner of investment bank's stock in issuer such that insider is liable under § 16(b) for his share of profits realized by investment bank from its purchase and sale of issuer's stock within six months); *Strauss,* 902 F.Supp. at 481 (complaint sufficiently alleged § 16(b) claim where complaint alleged that insider who was general partner of partnership and controlling shareholder of corporation was liable, by virtue of beneficial ownership, for short-swing profits realized by both partnership and corporation from purchase and sale of issuer's stock within six months).

In this case, plaintiff argues that the defendants acquired beneficial ownership of New Valley preferred stock once they acquired the right to receive performance-related fees based on the appreciation of New Valley preferred stock. Given the definitions quoted above, and viewing the allegations of plaintiff's proposed claim in a light most favorable to plaintiff, I agree that plaintiff has successfully alleged such beneficial ownership. However, to be more precise, the defendants became beneficial owners of *the Holders'* New Valley preferred stock when they acquired the right to receive a performance-related fee measured by the appreciation of the Holders' New Valley preferred stock in exchange for providing the Holders with financial advisory services.

However, this allegation of "beneficial ownership" is only one step in asserting a § 16(b)

claim against the defendants.[4] Plaintiff must also allege some combination of a purchase and sale, or sale and purchase, of New Valley preferred stock by the defendants and/or the Holders within a six month period. *See, e.g., Whiting,* 523 F.2d at 688–89; *Lamb,* 363 F.2d at 527; *Lehman,* 286 F.2d at 791; *Strauss,* 902 F.Supp. at 481–82.

Plaintiff's proposed claim fails to make this showing. Rather, plaintiff relies solely on the Assignment Agreement itself as a purchase, and the subsequent receipt of the fee as a sale. But, this characterization confuses the concept of "purchase and sale" with the concept of "beneficial ownership." While the Assignment Agreement may have rendered the defendants beneficial owners of the Holders' New Valley preferred stock, the Assignment Agreement did not itself constitute a § 16(b) "purchase" of New Valley preferred stock. Nor does the eventual receipt of the fee constitute a "sale."

While the complaint alleges a sale by the Holders after the defendants acquired beneficial ownership of the Holders' New Valley preferred stock, it does not allege a corresponding purchase by either the defendants or the Holders. Since plaintiff also fails to allege any other combination of purchases and sales, or sales and purchases, by the Holders or the defendants within a six month period, plaintiff's proposed cause of action fails to state a claim under § 16(b).[5]

Plaintiff's alternative argument is that the right to receive a performance-related fee in exchange for financial advisory services constitutes a derivative security which the defendants "purchased" through the Assignment Agreement and then sold within six months when the Holders sold their New Valley preferred stock and the defendants received their fee. This argument has no merit. As discussed above, the execution of the Assignment Agreement did not effect a transfer between Veritovtrade and the defendants since the transaction changed nothing of significance in the investment position of the defendants. *See Lamb,* 363 F.2d at 526. In addition, even if one looks to the Equity Appreciation and Advisory Agreement directly, plaintiff has failed to state a claim under § 16(b).

For the purpose of § 16(b), a derivative security is defined as

> any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security or similar securities with a value derived from the value of an equity security....

17 C.F.R. § 240.16a–1(c). As the name and the definition suggest, the main characteristic of a derivative security is that it derives its value from an underlying equity security. Plaintiff alleges that the right to receive a performance-related fee in exchange for financial advisory services meets this requirement, since the fee is measured by the appreciation of New Valley preferred stock. While this may be true, it is not the determinative factor for the purpose of § 16(b) coverage; the instrument at issue must first be a "security" as that term is defined under the Securities and Exchange Act of 1934.[6]

4. It is important to note that plaintiff has already alleged that the defendants are insiders by virtue of their membership in a "group" that, in the aggregate, owns more than ten percent of New Valley preferred stock. Although defendants do not concede this point, they do not challenge this allegation for the purpose of this motion.

5. Contrary to plaintiff's assertion, the question of whether a transaction constitutes a § 16(b) purchase and sale is a question of law. *Lewis v. Realty Equities Corp.,* 373 F.Supp. 829, 831 (S.D.N.Y.1974). Accordingly, the question of whether the transaction at issue in this case constitutes a "purchase and sale" can be appropriately resolved on this motion. I also reject plaintiff's argument that the transaction at issue in this case warrants an "unorthodox transaction" analysis. *See Kern County Land Co.,* 411 U.S. at 593–601, 93 S.Ct. at 1744–1748. Such an analysis is required only if the transaction at issue "reflect[s] the requisite qualities of transfer." *Morales v. Gould Investors Trust,* 445 F.Supp. 1144, 1148 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1369 (2d Cir.1978). As discussed above, that is not the case here. *See Id.* ("If there were a transfer of interest insufficient to constitute a 'sale'. then this Court cannot reach the question whether such transfers contained sufficient potential for 'speculative abuse' to trigger 16(b) coverage.").

6. Accordingly, plaintiff's citation of a SEC no-action letter, *see* Equifax, Inc., Fed. Sec. L. Rep. ¶ 76, 407, 1993 WL 963 (January 5, 1993), which describes a derivative security as one "tied solely

The 1934 Act defines the term "security" as

> any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas or other mineral royalty or lease, any transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing....

15 U.S.C. § 78c(a)(10). When a case involves an unusual instrument that does not fit squarely within one of the enumerated specific kinds of securities listed in this definition, courts look to the "economic realities" of the transaction to determine if the unusual instrument should be considered a security. *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 689–90, 105 S.Ct. 2297, 2303–04, 85 L.Ed.2d 692 (1985); *Seagrave Corp. v. Vista Resources, Inc.,* 696 F.2d 227, 230 (2d Cir. 1982). This "economic reality" test asks whether the transaction at issue " 'involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' " *Id.* at 689, 105 S.Ct. at 2303, *quoting, S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946).

Applying this test to the instant transaction illustrates that the Equity Appreciation and Advisory Agreement is not a "security" as that term is defined under the 1934 Act. The Equity Appreciation and Advisory Agreement is in reality an employment contract between the defendants and the Holders, in which the defendants are compensated for their financial advisory services with a percentage of the appreciation in New Valley preferred stock—presumably an appropriate measure of the value of their services.[7] Although an individual's investment in an enterprise may take the form of services instead of cash, *GBJ Corp. v. Sequa Corp.,* 804 F.Supp. 564, 568 (S.D.N.Y.1992), in this case the defendants' profits were not to come solely from the efforts of others, but from their own efforts to maximize value for the Holders.

In addition, the Equity Appreciation and Advisory Agreement does not fall within the ordinary concept of a security. There was no offer to a number of potential investors, nor was the agreement designed to be publicly traded. *See Marine Bank v. Weaver,* 455 U.S. 551, 559–60, 102 S.Ct. 1220, 1226, 71 L.Ed.2d 409 (1982). Rather, it was a unique agreement, negotiated one-on-one by the parties. *Id.* The fact that the agreement effectively gave the defendants a share of the Holders' profits from the sale of their New Valley preferred stock does not alone make the agreement a security. *Id.* Accordingly, plaintiff's new claim fails to allege the purchase and sale of "security" within six months.[8]

## *CONCLUSION*

For the foregoing reasons, plaintiff's motion is denied. Pursuant to the Court's prior order, dated April 11, 1997, the deadline for all non-discovery motions which do not concern amendment of pleadings or joinder of

to the market price of Company common stock or other equity securities," does not significantly aid the present analysis.

7. In 1991, creditors of New Valley filed an involuntary bankruptcy petition against New Valley. In 1994, several plans of reorganization for New Valley were proposed, none of which made provision for a distribution to the holders of New Valley preferred stock. Under the Equity Appreciation and Advisory Agreement, the defendants promised to use their best efforts to maximize the value received by the Holders in respect to the New Valley preferred stock under any plan of reorganization confirmed by the bankruptcy court.

8. Since I reach this result, I need not address whether the claim is barred by the statute of limitations.

the parties is enlarged to 30 days from the date of this Memorandum and Order.

It is SO ORDERED.