James **MERCER**, Plaintiff,

and

**The Goldman Sachs Group, Inc.,**
**Nominal Plaintiff,**

v.

**Rajat K. GUPTA, Defendant.**

**No. 11 Civ. 3828 (JSR).**

United States District Court,
S.D. New York.

July 27, 2012.

David Steven Preminger, Keller Rohrback L.L.P., New York, NY, David Martin Simmonds, Haley Kaye Krug, Mark Andrew Wilner, Seattle, DC, Ian S. Birk, William C. Smart, Keller Rohrback L.L.P., Seattle, WA, Jeffrey Iver Tilden, Gordon & Polscer, LLC, Portland, OR, for Plaintiff.

Alan Roy Friedman, Gary P. Naftalis, Michael Stewart Oberman, New York, NY, for Defendant.

## MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

Plaintiff James Mercer brings this "short-swing" profits action against defendant Rajat Gupta, a former director of Goldman Sachs, on behalf of nominal plaintiff Goldman Sachs, pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Mercer seeks to recover the profits Gupta allegedly realized from passing inside information regarding Goldman Sachs to Raj Rajaratnam, manager of the Galleon family of hedge funds. On November 23, 2011, Gupta moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6), and the Court, by Order dated December 23, 2011, granted the motion. This Memorandum sets forth the reasons for that ruling and directs the entry of final judgment. In brief, the Court concludes that Mercer has failed to plausibly allege that Gupta himself realized disgorgable profits from Rajaratnam's short-swing trades of Goldman Sachs stock. *See Roth v. Jennings,* 489 F.3d 499, 516 (2d Cir.2007).

The pertinent allegations, drawn from plaintiff's Complaint,[1] are as follows. Defendant Gupta was a member of Goldman Sachs' board of directors from November 2006 through May 2010. Compl. ¶ 3. Nonparty Raj Rajaratnam was the founder of

---

[1]. The allegations in Mercer's Complaint are drawn in turn from the allegations in the complaint brought against Gupta by the Securities and Exchange Commission ("SEC"), which is attached as Exhibit 2 to Mercer's Complaint. The SEC, however, is not suing as a shareholder and is not required to show that Gupta realized profits from Rajaratnam's trades (as opposed to other benefits realized by Gupta in exchange for the disclosures of inside information).

The Galleon Group, a family of hedge funds and hedge fund management entities, and was convicted of insider trading on May 11, 2011. *Id.* ¶ 4. On three separate occasions between June and October of 2008, Gupta provided Rajaratnam with material, non-public information about Goldman Sachs that Gupta learned solely by virtue of his status as a Goldman Sachs director, with the intention that Rajaratnam profitably trade on such information. *Id.* ¶¶ 15, 22, 28–29, 32, 37. (Separately, Gupta was recently convicted of portions of this misconduct.) Rajaratnam immediately made several trades in Goldman Sachs securities on the basis of the information Mr. Gupta provided to him, *id.* ¶¶ 23–24, 26, 30–31, 33, 38, netting millions of dollars in profits in various Galleon-related funds. *Id.* ¶¶ 15, 24, 26–27, 35, 40.

Separately, Rajaratnam was receiving inside information about other stocks from Anil Kumar, a former colleague of Gupta's. *Id.* ¶¶ 44–46. The Complaint speculates that since Gupta was allegedly aware Rajaratnam was paying Anil Kumar millions of dollars for his inside information, and that paying for inside information was Rajaratnam's standard practice, it is likely Gupta was also receiving payment from Rajaratnam for his tips. *See id.* ¶¶ 44–48; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss dated Dec. 7, 2011 ("Pl. Opp. Br.") at 5.

Such speculation aside, the Complaint alleges that Gupta took positions in certain Galleon funds, including Galleon's International and Voyager Funds, that in turn invested in other Galleon funds, including the so-called "Galleon Tech" funds that allegedly benefited from the trades on Gupta's inside information. Compl. ¶¶ 23–

40, 43, 47–48. In particular, the Complaint alleges, *inter alia*, that:

> By letter dated August 4, 2008, written on "Galleon letterhead," Rajaratnam represented "To Whom it May Concern" that Mr. Gupta's balance in Voyager was $16,406,974 through June 30, 2008—a mere few weeks after Mr. Gupta's inside information on Goldman Sachs' second quarter results resulted in a $13.6 million short-swing profit for the Galleon funds. Mr. Gupta's balance in Voyager was calculated based on something other than direct fair market value payments by Mr. Gupta for fund shares. It is most likely, and is therefore alleged, that at least a portion of Gupta's $16,406,974 balance in Voyager was a quid pro quo for bringing something new "to the party" in the form of inside information on Goldman Sachs securities that were profitably traded on the short-swing.

*Id.* ¶ 48.

Gupta never filed the statutorily required 16(a) letter disclosing what plaintiff alleges were short-swing profits. 15 U.S.C. § 78p(a); Compl. ¶ 12. Accordingly, Mercer, a Goldman Sachs shareholder, sent Goldman Sachs a statutory demand letter on March 11, 2011. Compl. ¶ 17. After Goldman Sachs took no action within the 60-day statutory period, *see id.* ¶¶ 17–21, Mercer filed this 16(b) action on June 6, 2011.[2]

▮▮▮ Section 16(b) provides that:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized

---

2. Although the Second Circuit has sometimes referred to Section 16(b) suits as "derivative," nonetheless, "[t]he standing requirements for shareholder derivative suits under Rule 23.1 of the Federal Rules of Civil Procedure are

not applicable to a [Section] 16(b) plaintiff." *In re XO Commc'ns, Inc.,* 330 B.R. 394, 430 n. 24 (Bankr.S.D.N.Y.2005) (internal quotation marks omitted) (quoting *Mendell v. Gollust,* 909 F.2d 724, 728 (2d Cir.1990)).

by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . involving any such equity security within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction.

15 U.S.C. § 78p(b). Section 16(b) is a strict liability statute that forces officers, directors, and ten percent owners to disgorge any profits realized by them on a so-called "short-swing transaction," *i.e.*, the purchase and sale, or sale and purchase, of their company's stock within a six-month period. *See At Home Corp. v. Cox Commc'ns, Inc.*, 446 F.3d 403, 407 (2d Cir.2006); *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir.1998) ("No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement."). It imposes "liability without fault within its narrowly drawn limits." *Foremost–McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); *accord Magma Power Co.*, 136 F.3d at 320–21 (2d Cir.1998) ("Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition."). To state a claim for relief under Section 16(b), a plaintiff must plead four elements: "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir.1998).

■ Here, Gupta moved to dismiss on the ground that the Complaint does not allege that Gupta purchased or sold any Goldman Sachs stock within a six-month period.[3] "Section 16(b) requires an insider to disgorge 'any profit realized *by him*' from short-swing transactions." *Roth v. Jennings*, 489 F.3d 499, 516 (2d Cir.2007) (internal quotation marks omitted) (quoting *Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962) (quoting § 16(b)) (emphasis in *Blau*). Plaintiff admittedly did not allege that Gupta himself purchased and sold Goldman Sachs securities. Instead, plaintiff argues that Gupta was a "beneficial owner" of *Rajaratnam's* purchase and sale of Goldman Sachs securities, and that therefore Gupta is liable for the profits he realized from Rajaratnam's trading. *See Morales v. New Valley Corp.*, 968 F.Supp. 139, 144 (S.D.N.Y.1997)

**3.** Gupta also moved to dismiss on the basis that plaintiff's claim was time-barred by the two-year statute of limitations in section 16(b). 15 U.S.C. § 78p(b); Memorandum of Law of Defendant Rajat K. Gupta in Support of His Motion, Pursuant to Fed.R.Civ.P. 12(b)(6), to Dismiss the Complaint dated Nov. 23, 2011 ("Def. Br.") at 2 n. 1. At the time Gupta moved to dismiss, the rule in the Second Circuit was that a section 16(b) claim was tolled until the plaintiff had "actual notice" that the defendant had realized short-swing profits. *Litzler v. CC Invs., L.D.C.*, 362 F.3d 203, 208 (2d Cir.2004). The Supreme Court of the United States, however, had granted certiorari in *Credit Suisse v. Simmonds* to address the appropriate tolling standard under section 16(b). Without regard to the statute of limitations issue, this Court dismissed plaintiff's claim on December 23, 2011, with opinion to follow. The Supreme Court subsequently rejected the *Litzler* rule in favor of a traditional equitable tolling rule that requires the plaintiff to show "(1) he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Credit Suisse Sec. (USA) LLC v. Simmonds*, —— U.S. ——, 132 S.Ct. 1414, 1419, 1421 n. 7, 182 L.Ed.2d 446 (2012). Since, however, this Court determined that plaintiff's claim fails on the merits, it need not address whether the statute of limitations now also barred his claim, or whether he could still invoke equitable tolling.

("Once an insider is determined to be the beneficial owner of a security directly owned by another individual, any purchase and sale of that security within six months, by the insider or by the direct owner, can be attributed to the insider for the purposes of § 16(b) liability.").[4] Rule 16a-1, the SEC regulation implementing section 16(b), defines a "beneficial owner" as any person "who directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities." 17 C.F.R. § 240.16a-1(a)(2). Pecuniary interest, in turn, means: "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." § 240.16a-1(a)(2)(i).

As examples of "indirect pecuniary interest," Rule 16a-1 lists:

(A) Securities held by members of a person's immediate family sharing the same household; provided, however, that the presumption of such beneficial ownership may be rebutted; see also § 240.16a-1(a)(4);

(B) A general partner's proportionate interest in the portfolio securities held by a general or limited partnership. The general partner's proportionate interest, as evidenced by the partnership agreement in effect at the time of the transaction and the partnership's most recent financial statements, shall be the greater of:

(1) The general partner's share of the partnership's profits, including profits attributed to any limited partnership interests held by the general partner and any other interests in profits that arise from the purchase and sale of the partnership's portfolio securities; or

(2) The general partner's share of the partnership capital account, including the share attributable to any limited partnership interest held by the general partner.

(C) A performance-related fee, other than an asset-based fee, received by any broker, dealer, bank, insurance company, investment company, investment adviser, investment manager, trustee or person or entity performing a similar function; provided, however, that no pecuniary interest shall be present where:

(1) The performance-related fee, regardless of when payable, is calculated based upon net capital gains and/or net capital appreciation generated from the portfolio or from the fiduciary's overall performance over a period of one year or more; and

(2) Equity securities of the issuer do not account for more than ten percent of the market value of the portfolio. A right to a nonperformance-related fee alone shall not represent a pecuniary interest in the securities;

(D) A person's right to dividends that is separated or separable from the under-

4. "Beneficial owner" has two distinct meanings in section 16(b). *Morales*, 968 F.Supp. at 143–44. In this context, beneficial owner refers to whether Gupta, a statutory insider, is liable for the profits realized on Rajaratnam's short-swing trading of Goldman Sachs securities. It is a concept separate from whether a person is a "beneficial owner" insider, *i.e.*, whether that person owns more than 10% of a company's securities such that he will be deemed a statutory insider in the first place. *Id. Compare* 15 U.S.C. § 78p(a)(1) (defining statutory insider as including "beneficial owner of more than 10 percent of any class of any equity security"), *and* 17 C.F.R. § 240.16a-1(a)(1) (defining "beneficial owner" "solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities"), *with* 17 C.F.R. § 240.16a-1(a)(2) (otherwise defining "beneficial owner"). Since Gupta concedes he is a statutory insider as a Goldman Sachs director, only the Rule 16a-1(a)(2) definition is relevant to this motion.

lying securities. Otherwise, a right to dividends alone shall not represent a pecuniary interest in the securities;

(E) A person's interest in securities held by a trust, as specified in § 240.16a–8(b); and

(F) A person's right to acquire equity securities through the exercise or conversion of any derivative security, whether or not presently exercisable.

§ 240.16a–1(2)(ii).

Mercer alleges that Gupta had three "indirect pecuniary interests" in Rajaratnam's short-swing trading of Goldman Sachs stock. First, he alleges that it is inferable that Gupta received quid pro quo payments from Rajaratnam in exchange for his insider information. Compl. ¶¶ 44–48; Pl. Br. at 12–14. Second, he alleges that Gupta had the "opportunity ... to profit" from the transaction through his close relationship with Rajaratnam and the Galleon funds. Compl. ¶ 43; Pl. Br. at 14–15. Third, he alleges that Gupta's financial interest in the Galleon portfolio securities was an indirect pecuniary interest in the short-swing trades themselves. Compl. ¶ 43; Pl. Br. at 15–16. The Court concludes, however, that none of these allegations is sufficient to make Gupta a beneficial owner of the Goldman Sachs shares Rajaratnam allegedly traded based on Gupta's inside information.

■ Starting with the alleged "quid pro quo" payments, the Complaint, as noted, alleges that since Rajaratnam had an alleged practice of paying for inside information and since Gupta allegedly knew that Anil Kumar received money for his tips from Rajaratnam, Gupta also "undoubtedly" received money as a quid pro quo for his inside information. Compl. ¶¶ 16, 44–46. This is far too speculative to survive dismissal. Moreover, even assuming *arguendo* that plaintiff had adequately alleged that Rajaratnam paid Gupta for tips, either directly or by rewarding him with

interests in Galleon funds, *see id.* ¶¶ 47–48, such quid pro quo payments do not give Gupta a pecuniary interest in the profits of the actual short swing trades executed by Rajaratnam. *See* 15 U.S.C. § 78p(b) (requiring disgorgement of "any profit realized by him from any purchase and sale"). This is because, even though Rule 16a-1 allows for an "indirect" pecuniary interest to satisfy beneficial ownership, such indirect pecuniary interest must still be an interest that is within the chain of receiving profits from the transaction, not from receiving a separate payment or benefit that is separate from the "profits realized" by the short-swing trade. *Id.*

With respect to this distinction, the Second Circuit's opinion in *Roth v. Jennings* is particularly instructive. In *Roth,* the Second Circuit held that an insider's "business dealings" with a person who realized short-swing profits, or even allegations of improved business prospects between the insider and the actual trader, did not constitute an indirect "pecuniary interest" for the insider. *Roth,* 489 F.3d at 516. In so holding, the Second Circuit focused on section 16(b)'s requirement that the insider disgorge "any profit realized *by him.*" *Id.* (emphasis in original). Quid pro quo payments would show that Gupta profited from passing on insider *information,* but not from the short swing *transaction* itself. *See id.* at 517 ("[W]hat is required for the imposition of strict liability on [the defendant] is that [the defendant] itself have realized profits from short-swing transactions."). Payment for information is not profit realized from the short-swing transaction.

Plaintiff also argues that beneficial ownership includes "shares held in another's name," and that Rajaratnam effectively held the Goldman Sachs shares in Gupta's name. Pl. Br. at 10–11. But what Rule 16a-1 lists as sufficient for beneficial own-

ership are trades made through the insider's "immediate family sharing the same household," trusts, or a partnership where he is a general partner, 17 C.F.R. § 240.16a–1(a)(2)(ii)(A)–(B), (E), and thus instances.where the insider.is still.indirectly profiting from the trade itself, albeit washed through another entity. *See* Arnold S. Jacobs, *An Analysis of Section 16 of the Securities Exchange Act of 1934*, 32 N.Y.L. Sch. L. Rev. 209, 225 (1988) ("The rationale for an expansive definition of 'beneficial owner' and 'beneficial ownership' is to discourage an insider from passing information to the holder of securities (such as his wife) if the insider *benefits economically from those securities*." (footnotes omitted) (emphasis supplied)).

Plaintiff also tries to analogize these quid pro quo payments to a "performance-related fee," which Rule 16a-1 also lists as an example of indirect pecuniary interest. 17 C.F.R. § 240.16a–1(a)(2)(ii)(C). But a performance-related fee is still tied to the return and profit on the actual transaction (as are all of the other examples listed by the SEC in Rule 16a-1), not simply payment for the inside information. It is still a fee that is paid for the performance of the short-swing trade, *i.e.,* profits. *See* § 240.16a–1(a)(2)(ii)(C)(2) ("A right to a *non*performance-related fee alone shall *not* represent a pecuniary interest in the securities." (emphasis supplied)).

It is this link to the profits from the short-swing trades that is the key to finding beneficial ownership. While the SEC's list in Rule 16a-1 is not an exhaustive list of indirect pecuniary interests, *see Strauss v. Kopp Inv. Advisors, Inc.,* No. 98 Civ. 7493(LMM), 1999 WL 787818, at *4–5 (S.D.N.Y. Sept. 30, 1999), all of the examples in Rule 16a-1 still tie the defendant's indirect pecuniary interest to the actual profit made on the trade, either because that profit was tunneled through another legal entity (*e.g.,* a general partnership) or

because it was realized by someone who was in a relationship so close to the insider as to make it reasonable to deem that the insider still realized the profits (*e.g.,* a spouse). Plaintiff cites no case that has extended Section 16(b) liability to payments made for inside information, without any showing that the tipper actually realized profits from the transaction. Tippers can be held liable under Section 16 if they have "beneficial ownership" of the short-swing transaction, but the fact that they received payment in return for their information does not create a pecuniary interest in the shares involved in the transaction.

Beyond quid pro quo, plaintiff also argues that because Rajaratnam gave Gupta "business opportunities" in exchange for inside information, namely, investing in Galleon and being named a director of certain Galleon funds, Compl. ¶¶ 3, 43; Pl. Br. at 14–15, he received an indirect pecuniary interest sufficient to give him beneficial ownership over the Galleon shares, as he had an "opportunity . . . to profit" from the short-swing transactions. 17 C.F.R. 240.16a–1(a)(2)(i). Again, under *Roth,* this fails. Neither an insider's "business dealings" with a person who realizes short-swing profits, nor allegations of improved business prospects between the insider and the actual trader constitute a "pecuniary interest" *in the short-swing transactions* for the insider. *See Roth,* 489 F.3d at 516. Again, Gupta's relationship with Rajaratnam and Gupta's role as a director and investor in certain Galleon funds do not show he had a pecuniary interest in the short-swing transaction, even indirectly.

Plaintiff's final argument for beneficial ownership is that Gupta had a pecuniary interest in the Galleon funds that profited from the Goldman Sachs trades. Specifically, the Complaint alleges that

Gupta was an investor in Galleon Voyager, a Galleon "master fund," which invested in other Galleon funds, including the Galleon Tech funds that profited from the short-swing trades. Compl. ¶ 43. Although this qualifies as an indirect pecuniary interest (which Gupta concedes), Rule 16a–1 creates a "safe harbor" defense for an insider whose profits come from the portfolio securities held by a corporation or other entity (like Galleon Voyager). 17 C.F.R. § 240.16a–1(a)(2)(iii). This safe harbor states that "[a] shareholder shall not be deemed to have a pecuniary interest in the portfolio securities held by a corporation or similar entity in which the person owns securities if the shareholder is not a controlling shareholder of the entity and does not have or share investment control over the entity's portfolio." *Id.*; *see Feder v. Frost*, 220 F.3d 29, 34 (2d Cir.2000) ("[A]ttributing a corporation's transactions in portfolio securities to all shareholders would clearly cast the net far too wide."). Since the "safe harbor" is an affirmative defense, Gupta must show that the defense is established on the face of the complaint in order to prevail on this basis on a motion to dismiss. *See Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir.2003).

The Complaint does not allege that Gupta was a controlling shareholder in the Galleon Tech funds, but plaintiff argues in his brief that Gupta had sufficient "investment control" over the trades such that the safe harbor does not apply. "Investment control" is not defined in Rule 16a–1. Courts in this District, however, have interpreted it with reference to Rule 12b–2, and have defined investment control as possessing the direct or indirect power to direct or cause the direction of the management and policies of a person's (or fund's) investments. *See, e.g., Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*, 194 F.Supp.2d 232, 243 (S.D.N.Y.2002) (citing 17 C.F.R. § 240.12b–2). Here, it is clear from the face of the Complaint that Gupta did not have such investment control over the Galleon Tech funds that allegedly executed these short-swing trades.

Plaintiff argues that since Gupta knew his tips to Rajaratnam would lead to Galleon trading on the information, he had or shared "influence and control" over the Galleon Tech funds' short-swing trading. Pl. Br. at 22 (citing Compl. ¶¶ 27, 35, 40). This is plainly wrong. A tipper may have influence over the causal chain that leads to the trade, but he does not have influence over the "management and policies," *Egghead.com*, 194 F.Supp.2d at 243, of how the tippee chooses to run his hedge fund (for example, choosing to profit on inside information in the first place). It is the manager's decision to trade on inside information, not the source's.

Plaintiff also argues that since Gupta was a director of Galleon Voyager, he was in a "high level" position giving him influence over portfolio strategy. Gupta was a director at the Voyager fund, a Galleon "master fund with assets that were invested in numerous Galleon hedge funds, including those that traded based on Gupta's illegal tips." But even assuming *arguendo* that Gupta, as a director of one Galleon master fund, had influence over that fund's investment decisions,[5] this still does not show that Gupta had influence and invest-

---

5. *Compare Feder ex rel. Ivax Corp. v. Frost*, 474 F.Supp.2d 520, 523 (S.D.N.Y.2007) (holding director of corporation did not have or share investment control because he was not officer or manager of corporation and did not control corporation's portfolio), *with Strauss v. Am. Holdings, Inc.*, 902 F.Supp. 475, 481 (S.D.N.Y.1995) (holding safe harbor did not apply where defendant, president and CEO of corporation that executed trades, conceded that he controlled corporation, allowing court to infer investment control over portfolio).

ment control over the *Galleon Tech funds* that were allegedly executing the short-swing trades. *See* Compl. Ex. 2 ("SEC Admin. Compl.") ¶¶ 8, 16–20, 24, 29–33. The Complaint alleges no facts (or even conclusory allegations) suggesting that Gupta had investment control over the Galleon Tech funds' investment strategy.[6]

Accordingly, Gupta can invoke the safe harbor on the face of the pleadings. More generally, he lacks any actionable pecuniary interest in Galleon's short-swing trading.

For the foregoing reasons, the Court reaffirms its December 23, 2011 Order dismissing Mercer's complaint with prejudice,[7] and directs the clerk to enter final judgment accordingly.

SO ORDERED.

---

**6.** Indeed, the SEC administrative complaint that plaintiff attached as an exhibit to his Complaint repeats over and over that after Gupta disclosed information, *"Rajaratnam caused* the various Galleon hedge funds that *he managed* to trade based on the material nonpublic information." SEC Admin. Compl. ¶ 2 (emphasis supplied); *see id.* ¶ 11 (Rajaratnam "served as *Portfolio Manager* of the Galleon Tech Funds" (emphasis supplied)); *id.* ¶¶ 16–18, 20, 24, 29–32, 36 (repeatedly stating that "Rajaratnam caused the Galleon Tech Funds" to trade); *see also* Compl. ¶ 4 (describing Rajaratnam as "managing partner" of all Galleon affiliates, and that he "had control over all Galleon hedge funds and Galleon related funds").

**7.** On February 2, 2012, the parties convened a joint telephone conference with the Court, during which plaintiff requested leave to amend his complaint to add factual allegations from the Government's superseding indictment in the criminal case against Gupta.

*See generally* Superseding Indictment dated Jan. 31, 2012, 11 Cr. 907(JSR) (S.D.N.Y.). Since the Court had already dismissed plaintiff's complaint with prejudice, the Court denied the motion to amend. On April 17, 2012, plaintiff made a similar application to add information drawn from the Government's bill of particulars, which the Court likewise denied. *See generally* Bill of Particulars dated Apr. 10, 2012, 11 Cr. 907(JSR) (S.D.N.Y.). Aside from the untimely nature of plaintiff's request for leave to amend, the Court, which presided over the criminal case against Gupta, also finds that none of these new allegations would lead to a different result in the instant case. The criminal documents allege only that Rajaratnam rewarded Gupta for sharing inside information; they still fail to show that Gupta had a pecuniary interest in the short-swing trades themselves. Similarly, no evidence presented at the criminal trial gave rise to any additional factual allegations plaintiff could add to his Complaint to cure this deficiency in his claim.